# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

TOMMY KING,                         )
                                    )
          Petitioner,               )
                                    )   No. 1:00-0017
v.                                  )   Judge Echols
                                    )
RICKY BELL, Warden,                 )
                                    )
          Respondent.               )

## MEMORANDUM

Pending before the Court is the Petition for Writ of Habeas Corpus filed under 28 U.S.C. § 2254 by Petitioner, Tommy King ("King").[1] (Docket Entry No. 26.) Respondent, Warden Ricky Bell ("the State"), filed an Answer to the Petition (Docket Entry No. 49) and later filed a Motion for Summary Judgment (Docket Entry No. 53), to which King responded in opposition.

The Court has carefully reviewed the Petition, the Answer, and the voluminous state court record, as well as the pleadings and exhibits the parties filed in support of and in opposition to the pending Motion for Summary Judgment. For the reasons stated below, both the Motion for Summary Judgment and the Petition for Writ of Habeas Corpus will be GRANTED IN PART and DENIED IN PART.

---

[1]This case is on remand to consider the merits of the habeas petition. See King v. Bell, 378 F.3d 550 (6th Cir. 2004) (holding petition not barred by statute of limitations).

1

The Motion for Summary Judgment will be DENIED on the following two issues: (1) whether King's Sixth Amendment right to effective assistance of counsel at the sentencing phase of trial was abridged because his attorneys (a) failed to investigate and present available mitigating evidence and (b) failed to object to the State's closing argument; and (2) whether the State failed to disclose Brady impeachment evidence that King could have utilized during the penalty phase to challenge the credibility of the State's rebuttal character witness, Detective James Jackson.

The Court will hold an evidentiary hearing on the two issues identified. As to all remaining claims, the Motion for Summary Judgment will be GRANTED and the Petition will be DENIED.

## I. FACTS AND PROCEDURAL HISTORY

### A. The Offense

This case arises from a murder and armed robbery that occurred on May 27, 1982, in Columbia, Tennessee. King, who was then thirty-two years old, and his accomplice, Ronald Davis, lived in Chattanooga, Tennessee. They left Chattanooga in a car owned by Davis's sister. The car broke down and was towed into Columbia. King and Davis left the car at a mechanic's shop near the Third Street Inn, a tavern owned by the murder victim, Mark Lockridge.[2] The pair stayed two or three days at the apartment of Johnny Sharp, where they met Carolyn Gunn, who knew them as "Tommy" and Ronnie."

King and Davis did not have enough money to pay for the car

---

[2]King and Davis are African American. Lockridge was also African American.

Case 1:00-cv-00017   Document 87   Filed 09/27/05   Page 2 of 113 PageID #: 1136

repairs, so Davis attempted to sell stolen clothing. Davis tried to sell a jogging suit to Abraham Webster at his house on May 26. Davis returned to Webster's sometime after three o'clock in the afternoon the next day, May 27, trying to sell a pair of blue jeans and a blouse. Davis asked Webster if he would be interested in buying a .357 Magnum, but Webster did not see the gun.

Davis and King went into the Third Street Inn between three and four o'clock on the afternoon of May 27 to try to sell men's blue jeans and jogging suits. A patron of the tavern, Daniel Harris, saw Lockridge and King engaged in a discussion in the kitchen area. Lockridge agreed to buy some blue jeans for approximately $60, but he produced a $100 bill in payment and neither King nor Davis could make change. Lockridge told them to come back later and he would pay them. Harris saw King and Davis return to the bar later, and he observed them with Lockridge in the kitchen area of the bar looking at "a big shiny gun," but he did not know who was showing the gun to whom. King and Davis stayed in the bar drinking beer for a while and then both left at different times. Thereafter, Lockridge tried to sell the blue jeans to patrons of the bar.

At approximately 10:30 p.m. on May 27, Harris was tending bar while Lockridge and William Johnson were in the kitchen rolling dice. Customers Tony Holt and Carolyn Gunn were also in the bar. King and Davis returned to the tavern and asked for Lockridge. Gunn was on her way to the restroom. She saw King and Davis walk in the door, and they did not appear to have anything in their

3

hands. Harris went into the kitchen to get Lockridge, who then walked in front of Harris back to the bar. As they turned the corner from the kitchen, King, who had stepped behind the bar, fired a shot into the ceiling with a shiny gun that looked like the one Harris had seen King, Davis and Lockridge examining earlier in the day. King said, "Here is what it is, I want everybody to lay on the floor and don't move." King and Davis scuffled with Lockridge and pushed him to the floor. The cash register sat on a small table to the side of the kitchen door close to Lockridge's head. Harris lay down on the floor in the doorway behind Lockridge between the bar and the kitchen. Johnson stood in the kitchen. King stepped over Harris into the kitchen and told Johnson to get on the floor. Davis then forced Holt, who had been asleep in a booth, to get behind the bar and lay down on the floor.

J.C. Venoi and Yolanda Williams pulled up in Williams' car at Venoi's home across the street from the tavern when the first shot rang out. Venoi crossed the street and entered the bar. He immediately ran into Davis near the door. Davis told him to "hit the back and get down." Venoi headed for the bathroom in the back of the bar. He did not know if Davis had a weapon. On his way to the back, Venoi saw Lockridge standing up near the beer cooler next to the bar. King was standing behind the bar, and Venoi saw Harris, Holt and Johnson lying on the floor in the back. Venoi dropped down to the floor in the kitchen and crawled to the bathroom, where he found Gunn sitting in the corner. Gunn was very

upset and Venoi tried to quiet her.  Venoi heard "a lot of talking" in the bar, but he could not identify who was saying what.

According to Harris, when Lockridge started to move, one of the men told Lockridge, "hold still, you are the one we are going to kill anyhow."  Davis tried to take money from the cash register. Lockridge jumped up and slammed Davis into the cash register. Harris raised up and looked.  He then heard a shot and rolled over. Harris believed King, who was right beside him, fired the shot, and Lockridge fell back to the floor.  Venoi heard that shot from his hiding place in the bathroom.

According to Harris, King then searched the victims' pockets and wallets for cash while Davis took money from the cash register. King opened Harris's wallet, but threw it down because Harris did not have any money.  King stated, "We ought to just kill you anyhow."  Harris answered, "Ah, man, don't do that."  King retorted, "Let's just kill them all."  Davis warned, "No, slim, let's don't do that."

Harris heard King take money and car keys from Lockridge. King then stepped closer to the kitchen and said, "Don't move, don't even raise your head up an inch, if you do, you don't know if I am gone or not, and I will just blow your brains out."

Outside the bar, Davis tried to get into Yolanda Williams's yellow Buick Electra parked next to Lockridge's nearly identical car.  When Williams objected, Davis got into Lockridge's car.  King left the bar, pointed a pistol at Williams and told him to get down on the ground.  The men then sped off in Lockridge's car.

5

Lockridge was critically wounded by the bullet that entered the base of his neck on the left side. He died one week later at Vanderbilt University Hospital.

Gunn told investigators the men's names were "Tommy" and "Ronnie." The police recovered Lockridge's car the next day outside the Chattanooga apartment of King's girlfriend. King and Davis were arrested at the apartment. King turned over the car keys. Police recovered the weapon, a .357 Magnum Python Colt, four-inch, nickel-plated pistol loaded with three shells, behind the bathroom radiator in the apartment. Ballistics tests confirmed the bullet that killed Lockridge was fired from the pistol. Both King and Davis gave statements to the police that King and Lockridge argued about payment for the clothes, Lockridge pulled a gun, King struggled with Lockridge for control of the gun, and the shooting was accidental.

**B. Indictment and Trial**

The grand jury indicted both men for felony murder in the perpetration of an armed robbery (Count I), premeditated murder (Count II), and armed robbery (Count III). Because the State sought the death penalty, the trial court appointed two attorneys to represent King, George L. Lovell and Gary M. Howell. Robert C. Sanders and Bobby Sands, of the District Attorney General's Office, prosecuted for the State. Pre-trial motions were heard, and the trial took place November 8-13, 1982. Selection of the death-qualified jury consumed two trial days and resulted in an all-Caucasian, all-male jury.

6

The State called fifteen witnesses who testified consistently with the facts set forth above. Harris demonstrated for the jury how far King was standing from Lockridge when he fired the second shot, but the record does not reflect the distance. The pathologist who conducted the autopsy, Dr. Lelia Mauricio, testified the entrance wound was a clean, sharp, oval or semicircular wound that measured one centimeter in diameter. The bullet traveled in a downward trajectory with no deflection. There was no exit wound. Dr. Mauricio recovered the main bullet, but there were also multiple fragments left in the body. She determined the cause of death to be upper spinal cord injury. She did not describe powder burns at the entrance wound because she received the body many days after the shooting.

Gunn testified she was a close friend of Lockridge and knew he owned a gun that he kept in a bank bag near the cash register. She told the jury she had held the gun. An investigator testified an empty bank bag was discovered next to the cash register after the shooting.

In his own defense, King explained that he and Davis returned to the Third Street Inn to collect money Lockridge owed them. When Lockridge refused to pay or produce the clothing, an argument ensued. Lockridge became angry and made a quick move to the waistband of his trousers. King grabbed Lockridge's arm, raised it into the air, and tried to twist the gun away when the gun fired, striking Lockridge in the neck. King said there was one man in front of him and one behind, so he fired a round into the ceiling

7

and told them both to get down on the floor because he was "afraid of [his] back when [he] was going out of the door." During direct examination, King admitted his previous convictions for attempt to commit a felony, possession of burglary tools, and kidnaping.

Davis did not testify. He called one witness, Benny Rosalez, Jr., a hospital medical records custodian, who testified that Lockridge's medical records indicated a 1.5 x 1.5 centimeter bullet entrance wound and a 3.3 x 4 centimeter powder burn. This was significant defense evidence because the State's firearms examiner, Lanny Wilder, had testified the diameter of a .357 Magnum bullet is 8 to 8.5 millimeters, just under one centimeter. Dr. Mauricio had testified the entrance wound was one centimeter in diameter. Wilder agreed with defense counsel on cross-examination that, if a gun were fired at close range, the gas from the gun's muzzle would cause the entrance wound to enlarge because the gas would follow the path of the bullet. King later argued to the jury that this evidence corroborated his own account of an accidental shooting at close range.

The State called two rebuttal witnesses, Lockridge's wife and brother, who testified that Lockridge did not own a gun. King sought to elicit Gunn's testimony that she was involved in a romantic relationship with Lockridge in an effort to show she was in a better position to know whether he owned a gun than were Lockridge's wife and brother. The court disallowed the testimony.

The State also recalled Venoi in rebuttal, who stated that, while he was in the bathroom, he heard only, "you are the one I was

8

supposed to kill anyhow." He confirmed he heard the second shot while he was in the bathroom and the statement was made after the second shot. The State also recalled Johnson and Harris, who told the jury they were with Lockridge earlier in the day and he was not carrying a gun.

The trial court instructed the jury on first-degree felony murder committed in the course of armed robbery, second-degree murder, and voluntary and involuntary manslaughter. The court did not instruct on Count 2, premeditated murder, or Count 3, armed robbery, due to the State's election to proceed only on Count 1.

The jury found King guilty of first-degree felony murder and Davis guilty of aiding and abetting second-degree murder. The jury set Davis's sentence at imprisonment for 99 years. The court imposed Davis's sentence and, at the jury's request, proceeded to the sentencing phase of King's trial the next morning, a Saturday.

King again took the stand. He stated he was thirty-two and had lived in Chattanooga twelve years. He talked briefly about his two brothers and two sisters, all living, and he stated both of his parents died in 1975, when he was twenty-seven. King was employed for eighteen months as an insurance salesman for Atlanta Life in Chattanooga, working on commission. He found a better paying job as a cook at the Brass Register Restaurant, where he worked for approximately two years until he had stomach surgery. After that, he helped his brother "off and on" with masonry. King stated he was divorced and had a three-year old boy who had visited the courtroom with his mother during the trial. He again admitted his

9

"scrapes with the law": receiving stolen property over $100, possession of burglary tools, two attempts to commit a felony and kidnaping.

King testified the kidnaping charge arose following a domestic dispute with his wife in 1977. He asked her to go for a ride and talk about their marital problems, but she refused. He "put her in the car" and they rode around Chattanooga for about an hour. When police stopped King for running a stop sign, King's wife told the police she was in the car unwillingly. King pled guilty to kidnaping, served seven or eight months of a two-year sentence, and continued to live with his wife for a period of time after his conviction until their divorce in 1978. King denied that he harmed his wife. Counsel asked if King had ever harmed anybody, to which he responded, "Not intentionally, no[,]" and counsel then tendered King for cross-examination. His entire direct testimony at the penalty phase was transcribed in eight and one-half pages.

The State's cross-examination consumed seventeen pages of the trial transcript. In reiterating King's employment history, the State brought out that King attended classes at the University of Tennessee - Chattanooga on a government job training program before he worked as an insurance salesman. King admitted his child was born out of wedlock, and he stated he supported the child as much as he could. As to criminal history, King testified his felony convictions occurred between 1977 and 1979. He admitted he was indicted for grand larceny of a television, went to prison for receiving stolen property, and was actually in prison during one of

10

the years he told the jury he was employed because he got mixed up on the dates.  He also conceded his first conviction for an attempt to commit a felony involved burglary of an automobile and his second conviction for attempt to commit a felony involved a robbery with three co-defendants.  He admitted that, at the time Lockridge was killed, he was on unsupervised probation for ten years imposed in 1977.  He denied he was supervised by a probation officer in Chattanooga, and denied that anyone had explained the rules of probation to him.  As to an attempt to commit robbery, King agreed his probation officer told him in 1979 to stay out of any more trouble.  In November 1979, his probation was revoked and he served additional months at the workhouse and was released in 1980.  The State admitted into evidence certified copies of King's prior convictions.

The State elicited testimony from King that he did not have any connection to Columbia, Tennessee, and he did not know anyone in the community, including the murder victim.  Finally, King stated that, at the time of the shooting, he lived in Chattanooga with his 28-year old sister, who paid the rent and utilities, and he helped out when he could.

Trial counsel asked three short questions on re-direct to clarify that two of the convictions, for burglary of an automobile and possession of burglary tools, occurred on the same day in September 1976.  King could not remember what was taken from the vehicle, but he recalled the burglary tool was a coat hanger. Defense counsel then rested the mitigation case.

The State called one witness, Detective James Jackson of the Chattanooga Police Department. Jackson had previously testified for the State in the guilt phase. He said he had known King for about seven years. He reported King's reputation in the community for truth and veracity was "bad" and stated he would not believe King's testimony in a court of law.

On cross-examination, defense counsel asked one question: "Detective Jackson, has the source of your information about Tommy King's reputation come from people who are drug dealers, involving drugs?" Jackson answered, "Some of them have, and some of them have just been victims." (Trial Tr. at 633-634.)

Counsel then gave closing sentencing arguments and the trial court again instructed the jury. After a forty-minute deliberation, the jury fixed King's punishment at death by electrocution.

The jury unanimously found three statutory aggravating circumstances: (1) King was previously convicted of one or more felonies, other than the present charge, which involved the use or threat of violence to the person; (2) King knowingly created a great risk of death to two or more persons, other than the victim murdered, during his act of murder; and (3) the murder was committed while King was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, robbery. The jury also unanimously found that there were no mitigating circumstances sufficiently substantial to outweigh the statutory

12

aggravating circumstances. The two statutory mitigating circumstances submitted to the jury were that "the defendant has no significant history of prior criminal activity involving threat or violence to the person" and the "murder was committed under circumstances which the defendant reasonably believed to provide a moral justification for his conduct." (Addendum No. 2, Trial Tr. at 677.)

## C. Post-Conviction History

The trial court denied King's motion for a new trial and his amended motion for a new trial. In a 4-1 decision, the Tennessee Supreme Court affirmed King's conviction and death sentence. State v. King, 694 S.W.2d 941 (Tenn. 1985). Justice Brock concurred in the majority opinion in all respects except as to the constitutionality of the death penalty. Id. at 947 (Brock, J., dissenting).

King then pursued post-conviction relief. Following an evidentiary hearing, the trial court dismissed the first post-conviction petition in 1988, and the Tennessee Court of Criminal Appeals affirmed in a short unpublished opinion the next year. King v. State, No. 88-221-III, 1989 WL 28912 (Tenn. Crim. App. Mar. 31, 1989). In August 1989, the Tennessee Supreme Court denied King permission to appeal.

13

King filed a second post-conviction petition on July 3, 1989.[3] The trial court held an evidentiary hearing and denied the petition. The Tennessee Court of Criminal Appeals affirmed in an unpublished decision. <u>King v. State</u>, No. 01C01-9512-CC-00415, 1997 WL 59464 (Tenn. Crim. App. 1997).

The Tennessee Supreme Court granted King's application for review to consider whether the jury's consideration of the felony murder aggravating circumstance warranted vacation of the death penalty under <u>State v. Middlebrooks</u>, 840 S.W.2d 317 (Tenn. 1992). In that case the Tennessee Supreme Court held use of the felony murder aggravating circumstance duplicated the elements of the underlying felony murder and failed to narrow the class of death-eligible murderers as required by Article I, Section 16 of the Tennessee Constitution and the Eighth Amendment to the U.S. Constitution.[4] The <u>Middlebrooks</u> holding directly contradicted the

---

[3]King filed his second petition "because of the uncertainty of the ultimate interpretation of the legislature and the Courts regarding the July 1, 1989 'Statute of Limitations' as to Postconviction petitions." (Addendum No. 15, Petition at 1.) Petitioner wanted "it to be clearly seen that he [was] not waiving [or] abandoning any claim of error in his case and [was] making every available effort to assert such." (<u>Id.</u>)

The statute of limitations for post-conviction petitions seeking relief for convictions which became final before July 1, 1986, technically expired on July 1, 1989. <u>Abston v. State</u>, 749 S.W.2d 487, 488 (Tenn. Crim. App. 1988). Because that day fell on a Saturday, the Court of Criminal Appeals extended the filing deadline to July 3, 1989. <u>Kilgore v. State</u>, No. 03C01-9405-CR-00173, slip op. at 3 & n.1 (Feb. 13, 1995).

[4]The Supreme Court held previously that an aggravating circumstance may duplicate an element of the capital offense if the class of death-eligible defendants is sufficiently narrowed by the definition of the offense itself. <u>Lowenfeld v. Phelps</u>, 484 U.S. 231 (1988).

14

Tennessee Supreme Court's earlier ruling against King on the same issue in his direct appeal. In <u>Howell v. State</u>, 868 S.W.2d 238 (Tenn. 1993), the Tennessee Supreme Court adopted a harmless error analysis for <u>Middlebrooks</u> error, and in <u>Barber v. State</u>, 889 S.W.2d 185, 186 (Tenn. 1994), ruled that <u>Middlebrooks</u> should be applied retroactively.

Applying <u>Howell</u> in King's case, a three-justice majority of the Tennessee Supreme Court held the <u>Middlebrooks</u> error was "harmless beyond a reasonable doubt due to the strength of the remaining valid aggravating circumstances and the relative weakness or absence of any mitigating circumstances." <u>King v. State</u>, 992 S.W.2d 946, 947 (Tenn. 1999). Two justices agreed that <u>Middlebrooks</u> error existed, but disagreed with the majority's application of <u>Howell</u> and the conclusion reached. <u>Id.</u> at 952 (Anderson, C.J., and Birch, J., dissenting). The dissenters believed that "resentencing is necessary because the State has failed to prove *beyond a reasonable doubt* that the sentence would have been the same had the jury given no consideration to the unconstitutional aggravating circumstance." <u>Id.</u> (emphasis in original).

## II. <u>STANDARD OF REVIEW</u>

The Court's review of the petition, filed in 2001, is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The Court may grant the writ of habeas corpus on a claim that was adjudicated on the merits in state court if that adjudication:

15

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); <u>Williams v. Taylor</u>, 529 U.S. 362, 405 (2000). The state court's factual findings are presumed to be correct and they can be contravened only if King can show by clear and convincing evidence that the state court's factual findings were erroneous. 28 U.S.C. § 2254(e)(1). King is entitled to an evidentiary hearing if he alleges sufficient grounds for issuance of the writ, relevant facts are in dispute, and the state courts did not hold a full and fair evidentiary hearing. <u>Sawyer v. Hofbauer</u>, 299 F.3d 605, 610 (6th Cir. 2002).

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(c); <u>Hutchinson v. Bell</u>, 303 F.3d 720, 728 (6th Cir. 2002). The opposing party must set forth facts showing that there is a genuine issue of material fact for trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). The evidence of the non-movant must be believed, and he is entitled to have all justifiable inferences drawn in his favor. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).

16

### III.   ANALYSIS OF THE CLAIMS

The Court will first explore whether trial counsel rendered ineffective assistance at the sentencing phase of King's trial and whether the State should have disclosed <u>Brady</u> impeachment evidence.[5]  Next, the Court will address the merits of other claims King raised in state court on direct appeal and in post-conviction proceedings and as to which the state courts granted review on the merits.  The Court will then turn to the claims King procedurally defaulted in state court and explain why King has not established cause and prejudice or a miscarriage of justice to overcome his procedural defaults.

For ease of reference, the Court will identify each claim by the paragraph number King assigned to it in the federal habeas petition.  King's numbering of the claims begins at ¶ 7 and ends at ¶ 38.

## A. Merits Review

### ¶ 23 - *Ineffective assistance of trial counsel at sentencing*

"The Eighth Amendment requires a jury to consider the circumstances of the crime and the defendant's character and background during the sentencing phase of a capital trial." <u>Byrd v. Collins</u>, 209 F.3d 486, 526 (6th Cir. 2000).  In deciding whether

---

[5]The recitation of King's numerous complaints about the performance of his trial counsel spans eight pages of the habeas petition.  (Docket Entry No. 26 at 15-22.)  Some, but not all, of the complaints were raised in state court.  Except for the two issues the Court will address on the merits, all other ineffective assistance claims were procedurally defaulted in state court.  <u>See</u> <u>Coleman v. Thompson</u>, 501 U.S. 722, 752-753 (1991).

King is entitled to habeas relief for trial counsel's failure to investigate and present mitigating evidence at sentencing, the Court must "evaluate the totality of the available mitigation evidence–both that adduced at trial, and the evidence adduced in the habeas proceeding[s] in reweighing it against the evidence in aggravation." <u>Williams</u>, 529 U.S. at 397–398; <u>Wiggins v. Smith</u>, 539 U.S. 510, 536 (2003).

The jury returned its verdict of guilt at 10:15 p.m., on Friday, November 12, 1982. (Addendum No. 2, Trial Tr. at 587.) The trial judge immediately sentenced Davis to prison as the jury recommended, and then set King's death penalty sentencing hearing to begin the next morning, Saturday, November 13. (<u>Id.</u> at 588.)

Based on the record presently before the Court, it appears that trial counsel expended minimal effort to prepare for the sentencing hearing. The attorneys' time records establish that lead counsel, George Lovell, billed 2 hours on the morning of the sentencing hearing for an "attorney discussion." He billed 4.8 hours for the hearing itself. (Docket Entry No. 72-1 at 7.) On the same morning, co-counsel Gary Howell billed 2.5 hours for "consultation with co-counsel" and 4.5 hours for the sentencing hearing. (<u>Id.</u> at 3.) <u>See</u> <u>Greer v. Mitchell</u>, 264 F.3d 663, 676–677 (6th Cir. 2001) (noting attorney time records indicated no preparation for sentencing until after guilt phase, and failure to anticipate finding of guilt to prepare for sentencing is constitutionally impermissible).

18

According to Howell's recent declaration, defense counsel focused their limited sentencing efforts on researching the statutory aggravating and mitigating factors and consulting with each other about the content of closing argument. (Docket Entry No. 79-4, Howell Decl. at ¶ 6.) Critically, Howell does not recall "making any factual investigation for the penalty phase of Tommy King's trial. The only preparation for sentencing that I am aware of took place after the jury returned their verdict of guilt." (Id. at ¶ 7.) King was a cooperative client, and he did not place any restrictions on the defense team concerning their investigation or preparation. (Id. at ¶ 4.)

At the time of trial, Howell was a new member of the bar. Shortly after he received his law license in 1982, the court appointed him to assist in representing King. Howell did not have any training or experience in homicide cases, let alone in capital trials. Lovell had practiced law for about seven years, but the record does not describe any experience he may have had in capital murder cases. (Id. at ¶¶ 1-2, 5.) Neither party presents this Court with Lovell's declaration.[6]

In 1987, assisted by newly-appointed counsel, Charles P. Dupree, King filed his first post-conviction motion, alleging, among other things, that he was denied his Sixth Amendment right to counsel at sentencing because trial counsel did not investigate his background and present available mitigating evidence. At the

_____

[6]This may be explained, in part, by the fact that George Lovell now serves as a General Sessions Judge in Maury County.

19

evidentiary hearing, however, neither King nor the State called the trial attorneys to testify.  King provided the court with a copy of the trial transcript.  King took the stand along with his brother, Bernard T. King, Sr., and his first cousin, Frances Brewer. (Addendum No. 8, Post-Conviction Tr. at 4-25.)

Bernard King worked in mechanical maintenance for the Tennessee Valley Authority and had done so for seventeen years. Frances Brewer worked as a systems engineer for IBM, a job she held for ten years.  Both would have been willing to testify at the sentencing phase that King was raised in a loving home, he grew up in the church, he was not a violent person, and murder would not have been in his character.

Brewer explained that King and his brother, Bernard, came to live with her parents, Alice and Jamie Brewer, when their own parents separated, so she and King were raised as siblings.  The two of them were extremely close, not only because they were raised together and he looked out for her, but because their parents, Alice and Jamie Brewer, were murdered.

Bernard King and Frances Brewer testified King's trial attorneys did not notify them about the trial, did not keep them apprized of developments in the case, and did not ask them to provide mitigation testimony.  Brewer learned from people on the street in Chattanooga that King was in jail in Columbia awaiting trial.  She visited King in Columbia before the trial.  King told her his attorneys would contact her, but they did not.  King did

not know the date of his trial.  Both witnesses learned about the trial after it was over.

On cross-examination, the witnesses conceded their family was not close at the time of King's trial.  Brewer did not make a point to tell family members about King's situation because of her own difficulties at the time.  She tried to visit him in Columbia a second time, but learned on her arrival that he had been convicted and transferred to the penitentiary.

King testified he provided his trial counsel with contact information for his brother, sister, and his biological father, who lived in New York.  King confirmed he did not tell Brewer the trial date because he did not know it himself.  On cross-examination, King admitted that he completed twelfth grade and could read and write, but he did not send his family any letters about his situation.  The prosecutor asked, "So you did not really perceive [your siblings] as actually taking the witness stand on your behalf?"  King replied, "Well, maybe not to testify about what happened in general, but you know, our lives together, I did have a family."  (Id. at 25.)  On redirect, King stated Lovell asked about family members and King told him about Bernard, Frances, another brother, and his biological father.  Lovell told King he would ask them to testify "[i]f we would get in touch with them." (Id.)

The trial court rejected the ineffective assistance claim, finding:

> [A]ny value that testimony of good rearing and character
> by the petitioner's family may have is nullified by the
> fact they did not have communication with the petitioner
> or each other during the time period relevant to the
> murder. Therefore, the court concludes as a matter of
> law that the petitioner's proof on this matter does not
> show that Mr. Lovell's failure to present these witnesses
> is outside the range of competence demanded of an
> attorney in a criminal case.

(Addendum No. 7, Order Dismissing Petition For Post-Conviction

Relief at 21.) Regarding the claim that counsel failed to object

to the State's improper closing argument during the penalty phase,

the court found:

> [A]s a general principle, personal opinions expressed by
> an attorney in closing arguments are not proper.
> However, the Assistant Attorney General did not
> specifically opine in his argument that this case
> deserved the death penalty. Rather, he opined that this
> case justified the Court in charging the jury on the law
> concerning the imposition of the death penalty. The Court
> therefore concludes as a matter of law that although the
> Assistant Attorney General's comment was improper, it was
> not of such magnitude or character that trial counsel's
> failure to object to it is outside the range of
> competence demanded of an attorney in a criminal case.

(Id.)

In a short, unpublished opinion, the Tennessee Court of

Criminal Appeals affirmed. King v. State, 1989 WL 28912 (Tenn.

Crim. App. Mar. 31, 1989). The appellate court observed:

> Neither side chose to call the appointed attorneys who
> initially represented defendant, although claims of
> ineffective assistance of counsel were made and relied
> upon. We have concluded that in this case remand for a
> new hearing is unnecessary, but there is much to
> recommend hearing from attorneys who have been accused of
> ineffective assistance during the course of the
> evidentiary hearing upon that issue.

Id. at *1. Concerning counsel's failure to investigate and call

family members to testify in mitigation, the appellate court

22

affirmed, concluding King failed to show prejudice, "that is, there is no showing of a reasonable likelihood that the sentencing body would not have imposed the death penalty if these witnesses had testified." Id. at *2. The court affirmed the trial court's reasoning with regard to the propriety of the prosecutor's closing argument. Id.

King again raised these two ineffective assistance claims in his second post-conviction petition. Through two new appointed attorneys, King submitted his affidavit averring that Dupree did not thoroughly explain the first post-conviction petition before the evidentiary hearing took place, King did not understand the importance of calling the trial attorneys to testify about the claims of ineffective assistance, and had he understood the importance of such testimony, he would have insisted that the witnesses be called.

King provided a second affidavit concerning mitigation testimony that could have been offered at his sentencing, including details about the murder of his parents in 1975 and the effect the killings had upon him, his remorse for Lockridge's death, his regular attendance at St. Phillips Lutheran Church with his parents as a youth, and his participation in school and community activities. He averred that his trial attorneys did not give him the opportunity to tell them about these matters in preparation for his sentencing hearing. (Addendum No. 19, Exs. 3 & 4.)

In an effort to prove the existence of mitigating circumstances that may have spared him the death penalty, King

23

filed a motion requesting funds to hire an investigator/mitigation specialist and a licensed psychologist on June 12, 1995. The trial judge heard argument on July 13, 1995, and summarily denied the motion in a short order eleven days before the scheduled evidentiary hearing on the second post-conviction motion. (Addendum No. 15 at 11-77; Addendum No. 16, Hr'g Tr.) King sought permission to take an extraordinary appeal on the denial of expert services, but the Tennessee Court of Criminal Appeals denied the request for a stay on July 24, 1995, the day of the evidentiary hearing, and denied the application for appeal on July 25, 1995. (Addendum No. 17.)

The evidentiary hearing occurred as scheduled. King testified only to authenticate his affidavits. Defense investigator James McCaslin, however, informed the court he located eleven witnesses who were not contacted by King's trial attorneys and who would have been willing to provide mitigation testimony about King's caring, non-violent nature, his positive upbringing, his involvement in school and church activities, his volunteer work with the elderly, his good reputation in the community, and his emotional devastation following his parents' brutal murders by individuals who were never identified and prosecuted. McCaslin described in detail what the witnesses would have said if called to testify. King introduced into evidence the billing records of his trial attorneys.

The trial court dismissed the entire second post-conviction petition on October 25, 1995, finding that the claims of ineffective assistance had been "previously determined." The

24

Tennessee Court of Criminal Appeals summarily affirmed, ruling the ineffective assistance claims had been "previously determined" in the first post-conviction proceeding and King was not constitutionally entitled to effective assistance of post-conviction counsel, citing State v. Oates, 698 S.W.2d 79, 81 (Tenn. Crim. App. 1985) and House v. State, 911 S.W.2d 705, 711-12 (Tenn. 1995). King, 1997 WL 59464 at *1-4.

In support of this federal habeas petition, King provides the declarations of several witnesses who would have been available and willing to testify on King's behalf at the sentencing phase of trial in 1982. Bernard King, who testified at King's first post-conviction hearing, provides more extensive detail about Tommy King's upbringing. (Docket Entry No. 72-3, Bernard King Decl.) For clarity, the Court will refer to King as "Tommy" and to his family members by their first names.

Tommy's biological parents, Bernie and Rosetta, separated when he was nine months old. Rosetta was an alcoholic. Bernie moved to New York after the divorce. Bernie's sister, Alice, and her husband, Jamie Brewer, accepted Tommy and his brother, Bernard, into their home and lovingly raised them with their own children, Freddy and Frances. Tommy's two other biological siblings, Lamar and Vicki, were raised by another family nearby. Tommy and Bernard considered the Brewers to be their parents, and they called Rosetta and Bernie by their first names. Alice Brewer tried to maintain a connection between Tommy and Bernard and their biological parents, and she never spoke negatively about Rosetta and Bernie. Rosetta

25

died of cirrhosis of the liver at age 32, when Tommy was approximately fourteen years old. (Id. at ¶¶ 1-7.)

Alice Brewer was an active force in Tommy's life. She was a constant presence at school, always volunteering and keeping in touch with teachers about her children's progress. Tommy was raised in a household that valued education, involvement in the church, polite manners and behavior, and sharing with others less fortunate, even though they lived in the projects. The Brewers disciplined their children, while Vicki and Lamar were raised with no supervision and were allowed to do as they pleased. (Id. at ¶¶ 8-11.)

As a teenager, Tommy started running around with Lamar and getting into trouble. On one occasion, after Alice Brewer disciplined Tommy and Bernard, Tommy asked to move to New York to stay with his biological father, Bernie. The Brewers allowed him to go, and Lamar went with him. (Id. at ¶¶ 11-13.)

Bernie did not maintain discipline. The boys developed a pattern of skipping school and getting into more trouble than they could have found in Chattanooga. When things got out of hand, Bernie asked Alice Brewer to take Tommy back, but neither of them had money to pay for his travel. Tommy thus spent his formative years in New York with little supervision. Bernard and Lamar entered the service during the Vietnam War. When Tommy tried to join with Lamar, he was rejected because of his young age. Tommy remained in New York and became addicted to heroin. Later, he returned to Chattanooga as a young adult. (Id. at 13-15.)

26

The turning point in Tommy's life was the murder of Alice and Jamie Brewer in 1975. Alice helped a mentally retarded and schizophrenic family member, Arnold Hughley, with cooking, shopping and finances. According to Bernard King, Black Moslems visiting the neighborhood teased Hughley with a rubber snake. Hughley grabbed a gun from his house and killed one of them. The police arrived and a huge crowd gathered. Black Moslems pulled up in a vehicle with a loudspeaker and announced to the crowd that no one should talk to the white police; they would seek their own justice for the killing. No one would talk to the police. (Id. at ¶ 16.)

The Black Moslems sought out the family and friends of Hughley for retribution. Alice and Jamie Brewer were abducted by men wearing ski masks. Neighbors witnessed the abduction. The Brewers' bodies were found a week later, shot and burned in an abandoned car in Alabama. The police arrested some Black Moslems returning to Tennessee with guns that matched the shells found at the scene. A photo lineup, which included pictures of those arrested with the guns, were shown to witnesses, who identified the men as having been in the neighborhood prior to the abduction posing as census workers going door to door asking questions about the Brewers and their friends and family. The arrested individuals were released for lack of evidence and the case was never prosecuted. Two other persons who associated with Hughley were also abducted and killed. Their bodies were found in Georgia. Four houses, including Bernard's and Vicki's, were firebombed. (Id. at ¶¶ 17-18.)

27

The injustice of the Brewers' murders overwhelmed Tommy King. His whole attitude toward life changed. He could not understand why the Brewers, who lived such good lives should have been murdered, and he who had lived a bad life should still be living. After the killings, Tommy would tell Bernard that he had seen and talked to "Mama." Bernard tried to convince him it was not possible, but he insisted he talked to "Mama." When Tommy worked at the Brass Register Restaurant in 1979, Bernard received phone calls from Tommy's boss asking him to come because Tommy was seeing and hearing something that others could not see or hear. Tommy insisted he was seeing "Mama" and was having a conversation with her. Tommy began using drugs to an even greater extent than before. His relationship with the mother of his young son ended just before the robbery and shooting in Columbia. (<u>Id.</u> at ¶¶ 19-22.)

Bernard knew that Tommy had been charged in Columbia. He tried to call Tommy's attorneys, but they did not return his calls. He did not understand that capital cases included a mitigation phase where personal information about Tommy and his family would be vital. Bernard would have testified about the events in Tommy's life if he had been contacted. He remains in close touch with Tommy King by telephone to this day. (<u>Id.</u> at ¶¶ 23-24.)

Tommy is one year younger than his brother, Lamar King. (Docket Entry No. 72-3, Lamar King Decl.) Lamar grew up with Vicki about one mile from where the Brewers lived. Lamar saw Tommy every day at school. He knew that Tommy was especially attached to

28

Alice. She imposed a curfew and would not let Tommy or Bernard go out after dark or before they did their homework. For Tommy, the move to New York was a total change, from parents who were very involved and in touch with what he was doing, to a total lack of supervision. After serving two tours in Vietnam, Lamar returned to New York addicted to black tar opium, cocaine and marijuana. He found Tommy addicted to heroin. They lived in New York another year and then returned to Chattanooga.

When the Brewers were murdered, "Tommy lost his whole world, his whole world crumbled[.]" (<u>Id.</u> at ¶ 17.) He "really broke down" when he saw their bodies. (<u>Id.</u> at ¶ 14.) He bottled his feelings inside and could not talk about it. Instead, he turned to drugs. Lamar saw Tommy almost every day during that period. Tommy had always been a calm person able to get along with others, but after the murders, he could not cope. Lamar believes that counseling would have helped Tommy, but in those days, counseling was not ordinarily pursued. Tommy had flashbacks and believed he actually saw and talked to Alice.

When Tommy was arrested for capital murder, Lamar was living in Chattanooga. The attorneys did not contact him, and he did not know that family information was important. Lamar would have been willing to testify about anything he knew about Tommy and the family. In fact, Lamar attended some of the trial, but the attorneys did not question him. (<u>Id.</u> at ¶ 18.)

Annie Williams lived with King from 1979 to May 1982. (Docket Entry No. 72-3, Williams Decl. at ¶ 1.) King often mentioned the

29

Brewers to her and told her how unjust it was that no one had been arrested for their murders. She believes their killings "really did something to Tommy's mind[.]" (<u>Id.</u> at ¶ 4.) As quickly as King would begin talking about the murders, he would stop and cry and then break off the conversation. Often he would holler "Mama" during sleep and frequently he woke up sweating from nightmares. (<u>Id.</u> at ¶¶ 2-5.)

Police arrested King for the Lockridge killing at Williams' apartment in May 1982. She was taken to the police station and kept there all day. King's attorneys did not contact her, even though she believes they surely had her name and address because King was arrested at her apartment. She would have been willing to testify about what she knew and believes she would have remembered more details at that time. (<u>Id.</u> at ¶ 8.)

Helen Mathis lived near the Brewers when King was growing up. (Docket Entry No. 72-3, Mathis Decl. at ¶ 1.) She was close to Alice Brewer, who had "loving rules." Everyone who met her loved her. (<u>Id.</u> at ¶ 3.) Because Mathis worked on Sundays, she sent her two boys to church with the Brewers and their children. When the Brewers' bodies were discovered, she stayed with the family until after the funeral. It was hard for all of the Brewer/King children to accept the way the Brewers were killed and the fact that no one was ever tried for their murders. It was especially hard for Tommy King. (<u>Id.</u> at ¶¶ 8-9.) Afterwards, he was heavily involved in drugs, and she saw him almost every day because he and her oldest son were best friends. Tommy would tell her two or three times a

week that he saw "Mama." (Id. at ¶ 10-12.) She tried to convince him it was his imagination, but he insisted he saw her. King's lawyers did not contact Mathis. She would have been willing to testify about King and his family. (Id. at ¶ 13.)

Lydell Lovelace grew up with Tommy King on the same street and went to the same schools. (Docket Entry No. 72-3, Lovelace Decl. at ¶ 1.) Neighborhood children went to the Brewers' to play. Lovelace moved to Gary, Indiana as a young man and picked up a heroin habit. When he and Tommy King both returned to Chattanooga, they shot up heroin together four or five times a day until the money ran out. (Id. at ¶¶ 5-7.) After the Brewers were killed, King's drug use escalated. He talked about their deaths all of the time. He was greatly distressed by their deaths and because no one was prosecuted. His whole life became a search for drugs to dull his pain. King used parabenzamine with heroin, known as a "speed ball," to feel the effect of the drug faster. (Id. at ¶ 8-10.) Lovelace overcame his drug addiction and has been "clean" for over twenty years. He owns a clothing business, works for the city of Chattanooga, and is an associate pastor. He also would have been willing to testify for King at his trial. (Id. at ¶ 12-13.)

Joseph Mathis grew up with King. (Docket Entry No. 72-3 at ¶ 1.) When King came back from New York, Mathis watched his older brother and King use heroin together. They would shoot up seven or eight times a day. Sometimes they were so shaky that Mathis helped them by holding the belt on their arms. They used a lot of different drugs and when they could not get heroin, they used

31

paregoric. (Id. at ¶ 5-7.) King used more drugs after the Brewers were murdered. (Id. at ¶ 9.) Mathis visited the Brewers' house after the murders, where Tommy King was staying. He saw King sitting on the piano bench with a big smile on his face; King said he had just seen his mother. (Id. at ¶ 10.) The defense team did not contact Mathis, although he would have been willing to testify on King's behalf. (Id.)

George McReynolds was the chef at the Brass Register Restaurant from 1975 to 1986. (Docket Entry No. 79-5, McReynolds Aff.) King worked as a cook for a period of months in the late 1970's under his direct supervision. On at least two occasions, King had "anxiety attacks" while at work. On one occasion, King passed out and EMT personnel were called. McReynolds learned from another cook that King's attacks were related to his disturbance over the murder of the Brewers. King's brother, Bernard, was called to the restaurant on these occasions. No one contacted him about King until August 2005. (Id.)

Joseph Davis worked with King in the kitchen at the Brass Register. (Docket Entry No. 72-3, Davis Decl. at ¶ 1-2.) King was a good worker. He told Davis the Brewers had been killed, but no one had been charged. The lack of prosecution was very frustrating to King, who had breakdowns because he could not get over their deaths. Davis and others took King outside to help him relax. Several times an ambulance was called because it appeared King was having a heart attack. (Id. at ¶ 4.) Davis described King's breakdowns as "seizures related to trauma. They seemed to hit

32

Tommy like a brick." (<u>Id.</u> at ¶ 5.) Davis would have been willing to testify if asked. (<u>Id.</u> at ¶ 6.)

Medical records show that King was hospitalized in late March 1979 for three small caliber gunshot wounds. (Docket Entry No. 73-4 at 8-9.) He suffered a graze abrasion to the left chest, a through-and-through shot of the right elbow, and a gunshot wound to the abdomen. He underwent surgery and left the hospital seven days later. (<u>Id.</u>)

Additional medical records indicate King was hospitalized in early December 1979 for a heroin overdose. (Docket Entry No. 73-4 at 2-7.) The medical history described King as "a 29-year old black male, who apparently has been tormented by the murders of his parents for some time now and apparently is especially tormented during periods of intoxication or drug abuse." (<u>Id.</u> at 5.) The report further stated: "Apparently, the patient has been feeling somewhat depressed of recent days and also has been again tormented by the thoughts of his parents' murder." (<u>Id.</u>) At the time of the overdose, King was no longer employed at the Brass Register Restaurant. He had been seen previously for an alcohol problem and had been recently jailed for public drunkenness and disorderly conduct. (<u>Id.</u>)

The discharge summary states: "Apparently his parents were killed three years ago, and since then he has had episodes of depression, heavy alcohol abuse, and IV drug abuse. No definite history of drug overdose in the past." (<u>Id.</u> at 3.) King was diagnosed with heroin overdose, depression, and chronic substance

33

abuse.  Following a psychiatric consultation, King was referred to the Chattanooga Psychiatric Clinic. (<u>Id.</u> at 4.)

George W. Woods, Jr., M.D., performed a neuropsychiatric evaluation of King in connection with this habeas petition. (Docket Entry No. 72-1 at 15-23.)  Dr. Woods interviewed King, who is now 55 years old, on May 25, 2005, and August 18, 2005.  In addition, he reviewed King's statement given to police at the time of the Lockridge shooting, the trial transcript, excerpts of the 1987 post-conviction hearing during which Bernard King and Frances Brewer testified, and King's 1995 affidavits filed in support of his second post-conviction petition.  Dr. Woods also examined the declarations described above.  He personally interviewed Joseph Davis and Lydell Lovelace.  Dr. Woods reviewed birth certificates of the family, academic records of the Brewer/King children, King's 1979 medical records concerning his gunshot wounds and heroin overdose, and King's conviction records.

In Dr. Woods' professional opinion, which he holds to a reasonable degree of medical certainty, King suffered from Post Traumatic Stress Disorder ("PTSD") at the time of the offense. (<u>Id.</u> at 16.)  He also opines that, at the time of the offense, King suffered from Cognitive Disorder Not Otherwise Specified, then known as atypical organic brain syndrome.  (<u>Id.</u>)  "These mental disorders, synergistic in their effects, impaired Mr. King's ability to conform his behavior to the law" at the time of the offense.  (<u>Id.</u>)

34

During the interviews, King told Dr. Woods that his brother, Bernard, knew the Brewers were not their parents, but he did not realize his "Aunt Rosetta" was his biological mother until her death. King felt a loss when Rosetta died, but not commensurate with losing a mother. After Rosetta died, Alice Brewer told King that Rosetta was his mother. The impact of the news was tumultuous for King and, in Dr. Woods' words, "sent him on an emotional transition from which he would never recover." (<u>Id.</u> at 16.)

When King went to live with his father, he was overwhelmed by the fast life of New York, and his relationship with his stepmother, also named Alice, was problematic. King's girlfriend quickly introduced him to heroin. (<u>Id.</u> at 17.) Although King progressed from snorting to intravenous use of heroin by his late teens, he also worked in the garment district with his father and at United Parcel Service in New York. King had a few brushes with the law in New York, but he was not convicted of any felonies. He returned to Chattanooga hoping to move away from his addiction, but he continued to shoot heroin. Yet, King worked while he maintained his drug habit, relying on wages to pay his bills and on shoplifting and theft to support his drug addiction. (<u>Id.</u>)

According to Dr. Woods, King's addiction was augmented by neurologically-derived difficulties in decision-making. King had difficulty with the Category Test, an instrument designed to examine decision-making and problem solving skills. Although King's IQ is average at 100, his ability to make informed decisions is impaired. "These cognitive deficits played into both his

continued addiction as well as his decision-making at the time of
the offense." (Id.) Because King has been incarcerated since 1982,
there apparently is no other causative factor for his poor
performance on the Category Test. (Id. at 19.)

In Dr. Woods' opinion, the attacks King suffered while working
at the Brass Register Restaurant were panic attacks, consistent
with an anxiety disorder. (Id. at 18.) King described daily
nightmares of the Brewer murders for years and occasional
nightmares to this day. He "could not get away from the
ruminative . . . thinking of his parents being burned, and was
tormented by thoughts of whether they were alive or dead as their
bodies were being burned." (Id.)

King felt "profound guilt for not having protected them from
their horrific death." (Id.) He recalled his last conversation
with Alice Brewer at her business, as several Black Moslems walked
by and glanced inside. She asked King if he thought they would
hurt her. He assured her they would not. He thought there would
be retaliation against Hughley, but he did not foresee that the
Brewers were in any danger. (Id.) "To have been so wrong has
crushed him, and, in many ways, broken his spirit. 30 years later,
Tommy King cried about the death of his parents and his inability
to have protected them." (Id.)

King described a high degree of panic and paranoia after the
murders. He was hyper-vigilant and would jump at almost any sound.
His traumatic stress increased when he was shot in March 1979. He
became increasingly fearful and depressed. By the end of 1979 he

36

was hospitalized with a serious heroin overdose that he "acknowledged was a suicide attempt." (<u>Id.</u> at 19.) In Dr. Woods' opinion, at the time of the offense, King met the Diagnostic and Statistical Manual-III (DSM-III) definition of PTSD. (<u>Id.</u>)

Dr. Woods reviewed a Supplementary Report filed by Detectives Messick and Hall which documented King's account of the offense as an accidental shooting and which included the sentence, "Mr. King asked about the condition of Mr. Lockridge." The statement was consistent with King's recollection during an interview with Dr. Woods that he and Davis called the police station to inquire about Lockridge's condition before they were apprehended.[7] In Dr. Woods' opinion, King

> described his own sense of fear and aroused startle response at the time of the offense. He acknowledged becoming hyper vigilant when, in his opinion, Mr. Lockridge appeared to be reaching for a gun. He also acknowledged calling the police station, attempting to see how Mr. Lockridge was faring. These behaviors are consistent with someone, who, after reacting strongly to a previously experienced stressor, was not able to conform his behavior to the law.

(<u>Id.</u> at 21.)

---

[7]The handwritten police report included the following paragraph:

> Mr. King asked about the condition of Mr. Lockridge and advised him that Mr. Lockridge was still alive but that he was serious. Mr. King appeared to be worried about Mr. Lockridge's condition.

(Docket Entry No. 71-2 at 7.) The last sentence was crossed out and did not appear in the final typewritten police report. (Docket Entry No. 71-2 at 5.)

In addition to all of this evidence, King provides copies of numerous documents supporting his social history, including birth, divorce and death records and newspaper articles reporting on the murders of the Brewers and the others, and the events that led up to the murders. (Docket Entry Nos. 72-3 at 16-30, 72-4 at 10, 73-1 at 1-8, 73-3 at 1-7, 73-4 at 1.)

Based on this record in opposition to summary judgment, it is apparent to the Court that trial counsel did not investigate King's social history to uncover evidence that could have been brought to the sentencing jury's attention in mitigation of the death sentence. In fact, Howell now attests that "[i]f I had known of the information contained in Dr. Woods' report I would have called the witnesses mentioned in the report and Dr. Woods to testify at Mr. King's trial as well." (Docket Entry No. 79-4, Howell Decl. ¶ 10.) Howell further avers: "These witnesses could have offered testimony to explain how Tommy got himself in this situation to begin with. I believe this evidence would have been quite relevant as mitigation in Mr. King's case." (Id.)

Because lead counsel, George Lovell, has not provided a declaration or testified in the state post-conviction proceedings, the Court does not know what he might have to say about his representation of King. The State has not had an opportunity to present Lovell's testimony, if it is favorable, in this habeas action nor has the State had a chance to cross-examine Howell or the new mitigation witnesses not presented in state court.

38

The law is clear, however, that King had a constitutionally-protected right to provide the jury with mitigating evidence that at least one of his trial attorneys now concedes he failed to discover and offer and that would have been helpful to King's case. Williams, 529 U.S. at 393. Howell candidly admits that he and Lovell confined their entire sentencing phase preparation to locating the death penalty statute and preparing for closing argument on the morning of the sentencing hearing. There is no indication on this record that counsel even discussed sentencing with King before the hearing began or that counsel prepared King for his sentencing testimony. Failure to investigate and prepare for a death penalty sentencing hearing cannot qualify as a reasonable, strategic decision of counsel when no investigation at all was done. See id. at 396. Cf. Bell v. Thompson, — U.S. —, 125 S.Ct. 2825, 2835 (2005) (noting counsel's strategic decision not to present a mitigation case, though unsuccessful, was based on a reasonable investigation into Thompson's background).

In assessing the reasonableness of counsel's investigation in this case, the Court must consider the quantum of evidence already known to counsel and whether the known evidence would lead a reasonable attorney to investigate further. Wiggins, 539 U.S. at 527. Based on King's guilt-phase testimony, it seems that counsel would have known before trial that, during the immediately preceding five- to seven-year period, the couple who raised King died; King committed a rash of felonies when he had not been previously convicted; the kidnaping crime involved King's wife,

with whom he continued to live after his conviction; King fathered a child by another woman following the divorce from his wife; his employment was sporadic, although he was a good worker; he had undergone major surgery, and he had attended the University of Tennessee. King testified he provided family contact information to Lovell, but the Court does not know on this record if those leads were followed. Also, the attorneys apparently made no effort to delay the sentencing hearing to allow more time to investigate and locate witnesses in preparation for testimony at the sentencing hearing. Had counsel investigated the facts already within their knowledge, they likely would have discovered much of the mitigating evidence that has now been revealed. See Wiggins, 539 U.S. at 525; Mason v. Mitchell, 320 F.3d 604, 623 n.12 (6th Cir. 2003) (observing limited information obtained by defense counsel did not discharge duty to investigate, but triggered it).

"With every effort to view the facts as a defense lawyer would have done at the time, it is difficult to see how counsel could have failed to realize that without examining the readily available [evidence] they were seriously compromising their opportunity to respond to a case for aggravation." Rompilla v. Beard, — U.S. —, 125 S.Ct. 2456, 2465 (2005). "Mitigating evidence . . . may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." Williams, 529 U.S. at 398. See also Eddings v. Oklahoma, 455 U.S. 104, 112 (1982) (noting consideration of defendant's life history is part of the process of inflicting the death penalty); Lockett v. Ohio,

40

438 U.S. 586, 604 (1978) (invalidating state law that did not permit consideration of defendant's background).

In three recent federal habeas cases decided post-AEDPA in which trial attorneys years ago performed deficient investigations prior to capital sentencing hearings, the Supreme Court granted the prisoners relief on the ground that they were denied constitutionally adequate assistance of counsel as compelled by the Sixth Amendment and the clearly established law of the Supreme Court stated in Strickland v. Washington, 466 U.S. 688 (1984). Rompilla, 125 S.Ct. at 2460-2461; Wiggins, 539 U.S. at 515-516; Williams, 529 U.S. at 369. In the 2000 Williams case, the Supreme Court applied Strickland to conclude that counsel's failure to discover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision because counsel had not fulfilled their duty to conduct a thorough investigation of the defendant's background. 529 U.S. at 396. The Court reversed the Fourth Circuit's decision, which, like the state courts, found no constitutional error, because the analysis was contrary to, and an unreasonable application of, clearly established Supreme Court law as stated in Strickland. 529 U.S. at 399.

Williams did not make new law. Wiggins, 539 U.S. at 522. "In highlighting counsel's duty to investigate, and in referring to the ABA Standards for Criminal Justice as guides," the Supreme Court applied the same "clearly established" precedent of Strickland that it applied in Wiggins. Id. In Strickland, the high court underscored that "counsel has a duty to make reasonable

41

investigations or to make a reasonable decision that makes particular investigations unnecessary[,]" 466 U.S. at 688-689, and directed that a particular decision not to investigate "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. at 691. The Strickland opinion had been available approximately five years when the Tennessee Court of Criminal Appeals ruled on King's first post-conviction appeal in 1989. See Mason, 320 F.3d 604, 614 (6th Cir. 2003) (under AEDPA, court must look only to Supreme Court holdings that existed at time of state court decision).

In Wiggins, the Supreme Court held that the attorneys' decision not to expand their investigation of the defendant's life history for mitigating evidence beyond the presentence report and social service records in their possession fell short of prevailing professional standards. 539 U.S. at 523-524. The Court reversed the Fourth Circuit's deference to the Maryland Court of Appeals' objectively unreasonable application of Strickland. Id. at 527-528.

In Rompilla, the Supreme Court held that a defense attorney is required to make reasonable efforts to obtain and review material that he knows the prosecution will rely on as evidence of aggravation even if the defendant and family members suggest that no mitigating evidence is available. 125 S.Ct. at 2460. This is a high standard imposed upon counsel to advocate for his client even if the client himself is not motivated to supply information

42

that might mitigate his sentence. The Court reversed the Third Circuit's decision that the Pennsylvania state courts had reasonably applied Strickland. Id. at 2461.

These cases are critically important here, for on the record as it stands before the Court, it appears trial counsel failed to conduct *any investigation whatsoever*, nor did they request additional time to do so, even though leads were available to them. See Mapes v. Coyle, 171 F.3d 408, 426 (6th Cir. 1999) (the "prospect of being put to death unless counsel obtains and presents *something* in mitigation" magnifies counsel's responsibility to investigate). In light of the prevailing standards governing attorney conduct at the time, King's attorneys had a duty and obligation to conduct a thorough investigation:

> It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty.

1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982) (quoted in Rompilla, 125 S.Ct. at 2466); Coleman v. Mitchell, 268 F.3d 417, 449 (6th Cir. 2001); Carter v. Bell, 218 F.3d 581, 596-597 (6th Cir. 2000). "The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing. . . . Investigation is essential to fulfillment of these functions." 1 ABA Standards for

43

Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed. 1982); <u>Wiggins</u>, 539 U.S. at 524.

The ABA standards describe counsel's obligation "in terms no one could misunderstand in the circumstances of a case like this one[.]" <u>Rompilla</u>, 125 S.Ct. at 2465-2466. The Supreme Court has long referred to the ABA standards as guides to determine what is reasonable when evaluating whether counsel performed deficiently. <u>Wiggins</u>, 539 U.S. at 524; <u>Williams</u>, 529 U.S. at 396; <u>Strickland</u>, 466 U.S. at 688-689; <u>Harries v. Bell</u>, 417 F.3d 631, 638 (6th Cir. 2005) (pre-AEDPA analysis). <u>See also</u> <u>Baxter v. Rose</u>, 523 S.W.2d 930 (Tenn. 1975) (directing Tennessee defense attorneys to turn to the ABA standards for guidance).

If it is true that trial counsel did not investigate mitigating evidence that would have helped King at the penalty phase, then such a failure would itself be objectively unreasonable. <u>Wiggins</u>, 539 U.S. at 523. The Court must measure counsel's performance for "reasonableness under prevailing professional norms," which requires "a context-dependent consideration of the challenged conduct" as seen from the perspective of counsel at the time. <u>Id.</u>; <u>Strickland</u>, 466 U.S. at 688. An abdication of advocacy on King's behalf at the penalty phase of trial, given the apparent availability of witnesses willing to testify, would constitute deficient performance under <u>Strickland</u>. <u>Id.</u> at 531-533; <u>Williams</u>, 529 U.S. at 391-398; <u>Rompilla</u>, 125 S.Ct. at 2467; <u>Harries</u>, 417 F.3d at 636-642; <u>Austin v. Bell</u>, 126 F.3d 843, 849 (6th Cir. 1997).

44

To establish that counsel's deficient performance constituted a Sixth Amendment violation, however, King must also show that counsel's conduct prejudiced his defense. <u>Wiggins</u>, 539 U.S. at 534 (citing <u>Strickland</u>, 466 U.S. at 692). Prejudice manifests where the defendant shows "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" <u>Id.</u> (quoting <u>Strickland</u>, 466 U.S. at 692). A "reasonable probability" is one sufficient to undermine confidence in the outcome. <u>Id.</u> "In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." <u>Id.</u>

The prejudice King suffered from what appears to be counsel's deficient performance at the sentencing phase comes directly from one of the attorneys. Howell attests that in the last twenty-three years of practicing law, he has handled many homicide and attempted homicide cases in Maury County and the surrounding area. (Docket Entry No. 79-4, Howell Decl. at ¶ 11.) Based on his experience, he now believes "that had the [mitigation] evidence been presented in Mr. King's case, the outcome of his case would most likely have been different." (<u>Id.</u>)

The trial transcript indicates that King's attorney knew of his checkered criminal history, but he failed to explain or try to mitigate this damaging evidence. He failed to present evidence of King's social history, the trauma caused by the murders of the Brewers, and other evidence that might have been offered to explain

45

the origin of his unusual criminal behavior between 1977 and 1979, and to mitigate the consequences of his actions.

Instead, Lovell, King's own attorney, asked, "Tommy, you have not been a choir boy have you?" (Addendum No. 2, Trial Tr. at 594.) Counsel then led his client a second time through a litany of his prior convictions. By failing to pay sufficient attention to pertinent dates when King was working or in prison, counsel left his unprepared client exposed to a withering cross-examination. Even though King stated he was mixed up on the dates, he may have damaged his credibility when he said he was working but actually he was in jail. His inability to recall the details of his life in the previous few years might not have seemed so devious if evidence had been presented to the jury about the extent of King's addiction to heroin, his reliance on theft and robbery to support his habit, and his mental condition following the murder of the Brewers.

The State followed King's confused and contradictory testimony with a law enforcement character witness, Detective James Jackson, who testified that King's reputation for truth and veracity in the community was "bad" and stated King could not be believed in a court of law. Counsel did not object to this opinion testimony or try to minimize the damage by presenting family members and friends who had a different opinion of King's reputation and veracity. Instead, defense counsel asked the witness if he got his information from drug dealers, which may have raised a suspicion to the jury that King might have been involved in dealing drugs, too.

46

No mention was made of some of the more positive aspects of King's past, such as his regular church attendance and participation in school and community activities as a child. The failure to introduce such favorable evidence opened the door for the prosecutor to argue in closing: "I never once heard from this defendant in the two times that he testified from this stand, that he ever [darkened] the door of a Church, not once did I hear that." (Addendum No. 2, Trial Tr. at 674.)

In addition, counsel did not ask King whether he felt any remorse for Lockridge's killing, or try to raise the possibility in the jurors' minds that King's assaultive behavior toward Lockridge, also an African American who allegedly had cheated him, may have been connected to his mental problems and latent hatred for the Black Moslems who murdered the Brewers.

In pursuit of the death penalty, the prosecutor repeatedly commented on the absence of mitigating evidence:

> Then there are some mitigating factors. . . . you could consider the defendant has no significant history of prior criminal activity, well that is out. By his own mouth he is a professional criminal without regard to the law.

(Docket Entry No. 50, Addendum 2, Trial Tr. at 642.)

> The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance; that is not present. No hint of anything of that nature in this record.

(Id.)

> [T]he defense may argue that the murder was committed under circumstances which the defendant reasonably believed to provide a moral justification for his conduct. . . . What morals does Tommy King argue from;

47

the morals of Tommy King, that what is yours can be mine, and what laws are made are made for you but not for me, probation is for somebody else, I am on probation but what does it matter I will come to Maury County and do as I wish, and I will do as I wish in Hamilton County, and go back and beat the system.

(Id. at 643.)

     The defendant was an accomplice in the murder, this again is a mitigating (sic), committed by another and the defendant's participation was relatively minor, major actor, the star of the show as far as murder, death, and robbery go.

(Id. at 643-644.)

     The youth or advanced age of the defendant at the time of the crime, he can neither claim youth, or he can neither claim advanced age; he is thirty-two (32) years of age, about the average age of this jury if we averaged your age out.

(Id. at 644.)

     The capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law as a result of mental disease defect intoxication. That is not present.

(Id.)

     Where is (sic) the mitigating circumstances upon which the defendant can argue to you credibly that he should not be held accountable for his deeds and suffer the consequences. Now, you promised me, you promised everybody, and you promised your God under oath, and you promised this Court that you will follow the law and the facts; and I believe that you meant that oath, and I believe that you are just real serious about it.

(Id.)

But I will draw one stark contrast for you between Mr. Lovell's emotionalism and that of his client, and ask you if at any time from this witness stand you ever saw one tear of remorse from Tommy Lee King? Not one. And I apologize for raising my voice . . . but it just seems to me . . . it provides a really stark contrast to this man who by his own testimony for the greater part of his life, adult life, has done nothing but rob and steal and

48

live off the illegally obtained goods of those honest
people who have worked for it.

(Id. at 670.)

We also [have] the matter of the mitigating
circumstances, and I can't find them, they are just not
there.

(Id. at 672.)

We have a man who has been afforded all of the benefits
of the society, of this system, who has gotten into
trouble and we have made attempts to rehabilitate him
with probation, we have made attempts to let him come
back on to the streets and learn to live within our
society and adapt himself to your rules, and he has
flaunted it. . . . Now, he has demonstrated finally and
for all times that he never intends to adapt himself to
the rules of civilized behavior and, therefore, this
society can no longer tolerate him, now that is what it
boils down to.

(Id. at 675.)

This was a cold-blooded first degree murder, and if there
was ever in my opinion a case that justifies the
imposition of . . . the death penalty, gentlemen, this is
it.

(Id.)

Had the jury heard some of the mitigating evidence which could
have been presented in King's favor, there is a reasonable
probability that the outcome of the sentencing would have been
different. See Strickland, 466 U.S. at 692. Such evidence
included his solid upbringing in a good home after the separation
of his parents, his attendance at church and school, his early
discipline and good work ethic, the horrifying murders of the
Brewers by members of the Black Panthers, his guilt and subsequent
nightmares for failing to protect them even after he reassured
Alice Brewer that she was safe, his undisciplined lifestyle as a

49

youngster in New York where he became addicted to drugs, his continuing frustration with the system that did not prosecute the Brewers' killers but prosecuted him, his addiction to other drugs when he returned to Chattanooga, the loss of his close personal relationships, his own wounding by gunfire, and his mental problems and suicide attempt. King was not limited to presenting evidence to support only the statutory mitigating factors; he was entitled to present *any* relevant mitigating evidence. <u>Hitchcock v. Dugger</u>, 481 U.S. 393, 398-399 (1987); <u>Skipper v. South Carolina</u>, 476 U.S. 1, 4 (1986); <u>Eddings</u>, 455 U.S. at 110; <u>Lockett</u>, 438 U.S. at 604. The jury was entitled to hear this information to complete fairly and accurately their sentencing task. As the Supreme Court said in <u>Gregg v. Georgia</u>, 428 U.S. 153, 190 (1976) (emphasis in original):

> If an experienced trial judge, who daily faces the difficult task of imposing sentences, has a vital need for accurate information about a defendant and the crime he committed in order to be able to impose a rational sentence in the typical criminal case, then accurate sentencing information is an *indispensable prerequisite* to a reasoned determination of whether a defendant shall live or die by a jury of people who may never before have made a sentencing decision.

One juror, having heard the mitigation evidence, might have voted differently.[8] <u>See</u> <u>Wiggins</u>, 539 U.S. at 537 ("Had the jury been

---

[8]The Tennessee statute required the jury to vote unanimously to impose the death sentence:

> (g) If the jury unanimously determines that at least one statutory aggravating circumstance or several statutory aggravating circumstances have been proved by the state beyond a reasonable doubt, and said circumstance or circumstances are not outweighed by any mitigating circumstances, the sentence shall be death.

50

able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance.")

The mitigating evidence amassed in King's post conviction proceedings "adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury, and although we suppose it is possible that the jury could have heard it all and still have decided on the death penalty, that is not the test." Rompilla, 125 S.Ct. at 2469; Harries, 417 F.3d at 640. The undiscovered mitigating evidence, taken as a whole, "might well have influenced the jury's appraisal" of King's culpability, see Williams, 529 U.S. at 398; Wiggins, 539 U.S. at 538, and "the likelihood of a different result if the evidence had gone in is 'sufficient to undermine confidence in the outcome' actually reached at sentencing.[9]  Rompilla, 125 S.Ct. 2469 (quoting Strickland, 466 U.S. at 694).

_____

Tenn. Ann. Code § 39-2-203 (1979). Thus, King needed to persuade only one juror to vote against the penalty of death.

[9]Penitentiary records show that, in twenty-three years as a death row prisoner, King has demonstrated a positive attitude, shown respect to staff and fellow inmates, maintained a clean cell, worked diligently at a prison job, participated in activities and programs, and refrained from misconduct that would result in disciplinary action. In return, he is respected and liked by staff and inmates. (Docket Entry Nos. 77-5 at 3-40; 78-1 at 1-35; 78-3 at 1-40; 78-4 at 1-29; 78-5 at 1-7.)
"Such evidence of adjustability to life in prison unquestionably goes to a feature of the defendant's character that is highly relevant to a jury's sentencing determination." Skipper, 476 U.S. at 7 n.2.

The Sixth Circuit has come to similar conclusions in recent cases. See Mason v. Mitchell, 320 F.3d 604, 624-626 (6th Cir. 2003) (remanding for evidentiary hearing concerning failure to develop mitigating evidence of petitioner's troubled childhood); Coleman, 268 F.3d at 450-452 (finding ineffective assistance during mitigation phase for failure to investigate or present evidence of troubled background); Greer, 264 F.3d at 676-677 (finding significance in counsel's failure to begin preparation for mitigation phase until after verdict of guilt); Skaggs v. Parker, 235 F.3d 261, 269-270 (6th Cir. 2001) (finding failure to present meaningful mitigating evidence fell below Sixth Amendment standard); Carter, 218 F.3d at 600 (holding counsel's complete failure to investigate and present mitigation caused such prejudice that court need not decide deficient performance); Groseclose v. Bell, 130 F.3d 1161, 1170-1171 (6th Cir. 1997) (holding counsel's failure to present mitigating evidence was only one of many constitutional errors); Austin, 126 F.3d at 848 (finding failure to investigate and present mitigation case undermined adversarial process); Glenn v. Tate, 71 F.3d 1204, 1206-1208 (6th Cir. 1995) (holding failure to present mitigating evidence of mental history and capacity resulted in unreliable outcome).

As stated earlier, in denying post-conviction relief, the state trial court ruled that "any value that testimony of good rearing and character by the petitioner's family may have is nullified by the fact they did not have communication with the petitioner or each other during the time period relevant to the

52

murder." (Addendum No. 7 at 21.) Accordingly, the court concluded "*as a matter of law* that the petitioner's proof . . . does not show that Mr. Lovell's failure to present these witnesses [was] outside the range of competence demanded of an attorney in a criminal case." (<u>Id.</u> (emphasis added).)

The <u>Strickland</u> decision had been issued three years before. The state court's analysis plainly violates <u>Strickland</u>'s guidance for determining deficient performance of counsel, discussed at length in <u>Wiggins</u> and <u>Williams</u>, because the court summarily discounted the worth of the evidence without evaluating whether counsel's performance in failing to present the mitigation evidence to the sentencing jury fell below the prevailing professional norms at that time. Counsel's failure to call the mitigation witnesses transgressed <u>Baxter</u>, the substance of which was later adopted in <u>Strickland</u>, and the ABA Standards in existence at that time. Consequently, the ruling is contrary to the Supreme Court's clearly established precedent. 28 U.S.C. § 2254(d); <u>Williams</u>, 529 U.S. at 404-406.

Moreover, the Tennessee Court of Criminal Appeals affirmed on the basis that King failed to show prejudice, "that is, there is no showing of a reasonable likelihood that the sentencing body would not have imposed the death penalty if these witnesses had testified." <u>King</u>, 1989 WL 28912 at *2. The appellate court also joined the trial judge in misconstruing what the prosecutor actually said in closing argument in order to reject King's claim that his counsel should have objected to improper argument. The

53

appellate court ruled the prosecutor did not specifically give his opinion that the case deserved the death penalty. Rather, the prosecutor opined that the case justified the Court in charging the jury on the law concerning the imposition of the death penalty.

In truth, the transcript reveals the prosecutor argued: "This was a cold-blooded first degree murder, and if there was ever *in my opinion* a case that justifies the imposition of . . . the death penalty, gentlemen, this is it." (Addendum No. 2, Trial Tr. at 675 (emphasis added).) The expression of the prosecutor's personal opinion could not be more clear. The trial court acknowledged the comment was improper, but ruled it was not "of such magnitude or character that trial counsel's failure to object to it [was] outside the range of competence demanded of an attorney in a criminal case." (Id.)

In reviewing these holdings, the Court must determine whether the state court's application of clearly established federal law was objectively unreasonable. Williams, 529 U.S. at 409-410. An unreasonable application of federal law is different from an incorrect application. Id. at 410. This Court cannot issue the writ simply because it concludes in its independent judgment that the state court decision applied clearly established federal law erroneously or incorrectly. Id. at 411. The application of Strickland must also be unreasonable. Id.

The Court determines that the Tennessee Court of Criminal Appeals' summary application of Strickland was objectively unreasonable. As in Wiggins, the mitigating evidence counsel

54

failed to discover and present "is powerful." <u>Wiggins</u>, 539 U.S. at 534. There is a reasonable probability that a competent attorney, aware of this history, would have introduced it at King's sentencing in an admissible form. <u>See</u> <u>id.</u> In fact, trial attorney Howell now admits it likely would have made a difference in the penalty if only the evidence had been presented.

Moreover, the prosecutor interjected his personal opinion about the justification or necessity of the death penalty during closing argument and defense counsel did not object. <u>See</u> <u>Byrd</u>, 209 F.3d at 537 (observing it is improper for prosecutor to state personal opinions about guilt of defendant or credibility of witnesses). Counsel's failure to react to this and other improper statements in the State's closing arguments amounted to deficient performance, and King suffered prejudice under <u>Strickland</u>.

The state court's conclusion to the contrary was objectively unreasonable. Thus, the highest state court decision qualifies as one involving an unreasonable application of clearly established federal law, as set forth by the Supreme Court. 28 U.S.C. § 2254(d)(1); <u>Williams</u>, 529 U.S. at 407-409. This Court's conclusion that the state courts applied <u>Strickland</u> in an objectively unreasonable manner is confirmed by the Supreme Court's similar decisions in <u>Williams</u>, <u>Wiggins</u>, and <u>Rompilla</u>, and in the Sixth Circuit's decisions in <u>Harries</u>, <u>Mason</u>, <u>Austin</u>, <u>Carter</u>, <u>Groseclose</u>, <u>Greer</u>, <u>Skaggs</u>, <u>Coleman</u>, and <u>Tate</u>.

The Court will not issue a final ruling on this issue, however, until an evidentiary hearing is held. <u>See</u> <u>Sawyer</u>,

55

299 F.3d at 610-611. King has shown sufficient grounds for a new sentencing hearing if he prevails in showing his counsel performed deficiently, and the facts are presently incomplete or they may be disputed. See id. at 610. Although the state court conducted an abbreviated evidentiary hearing on King's first post-conviction motion, the Tennessee Court of Criminal Appeals recognized the record was incomplete because neither party called Lovell and Howell to testify. King, 1989 WL 28912 at *1. Unfortunately, the appellate court declined to remand the case for a new hearing at that point despite its admonition that "there is much to recommend hearing from attorneys who have been accused of ineffective assistance[.]" Id. In light of the record as it stands today, the Court cannot say that the state courts ruled after a full and fair evidentiary hearing. See Sawyer, 299 F.3d at 610. Consequently, because this Court, too, has not heard from counsel, other than to read Howell's declaration, the Court will grant King an evidentiary hearing on the claim of ineffective assistance of trial counsel at the sentencing phase to resolve any factual disputes that may remain.

### ¶ 22 - *State's failure to disclose impeachment evidence*

Detective Jackson appeared as the State's character witness during the penalty phase, informing the jury that King's reputation in the Chattanooga community for truth and veracity was "bad" and that he would not believe King in a court of law. This struck a strong blow to the woefully deficient mitigation case, since King was the only one who testified.

56

As it turns out, Detective Jackson's own credibility might have been seriously damaged on cross-examination if trial counsel had been able to impeach him with evidence of internal police investigations and conclusions concerning his own corrupt conduct as a police officer and his failure to tell the truth about his actions. In connection with this federal habeas petition, King produced copies of City of Chattanooga Police Department documents relating to Detective Jackson's unscrupulous activities. (Docket Entry Nos. 77-4 at 4-24; 77-5 at 1.) Most of these documents concern events that occurred in 1977 to 1982, so the information would have been available for use at trial.[10]

In denying King's motion for discovery in this habeas case, (Docket Entry No. 64 at 10), the Court accepted the State's suggestion that the Brady claim is procedurally barred because King did not raise it at the state level. The Court reconsidered the issue in light of Banks v. Dretke, 540 U.S. 668 (2004), however, and now concludes that King has shown cause and prejudice to excuse his procedural default. To understand the Banks holding as it applies to this case, it is important to review the Supreme Court's jurisprudence on impeachment evidence and the particular facts of this case.

Long before King's trial, the Supreme Court established that the prosecutor bears an obligation to disclose to the defense

---

[10]One document involves an incident that occurred in November 1984. Obviously, those facts could not have been used to impeach Detective Jackson in 1982.

57

evidence that may be used to impeach the State's witnesses. <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972) ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within the rule of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) (relying on <u>Mooney v. Holohan</u>, 294 U.S. 103 (1935) and <u>Pyle v. Kansas</u>, 317 U.S. 213 (1942)). The Supreme Court confirmed <u>Giglio</u> in the 1985 case of <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985), issued one month before King's conviction and death sentence became final on direct appeal. <u>King</u>, 694 S.W.2d at 947. Subsequent Supreme Court cases emphasized the same theme, <u>see e.g.</u>, <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995); <u>Strickler v. Greene</u>, 527 U.S. 263 (1999); <u>Banks</u>, 540 U.S. at 691, and the Sixth Circuit follows Supreme Court law. <u>See e.g.</u> <u>Byrd</u>, 209 F.3d at 516-519; <u>Workman v. Bell</u>, 178 F.3d 759, 766-767 (6th Cir. 1998).

During a motion hearing before King's trial, one of the State's two prosecutors represented to the trial court that he met with defense counsel and the parties reached agreement on discovery material to be disclosed with the exception of two matters not at issue here. (Addendum No. 2, Trial Tr. at 4.) Turning to counsel, the prosecutor asked, "what matters did we not cover the other day that you think that we still have?" (<u>Id.</u>) Davis's counsel responded by asking the court to direct the State to turn over certain witness statements and "any exculpatory evidence, or any evidence that might tend to mitigate the degree of the crime in the case on the punishment to which the defendant might be subject."

58

(Id. at 5.)  Counsel repeated his motion for evidence "in the possession of the state that would tend to mitigate or exculpate the defendants." (Id. at 7.)  King joined in these requests. (Id. at 10.)  Although the prosecutor objected that the defendants were not entitled to the witness statements, he voluntarily turned them over and stated, "here is all that I have that was provided by the detective."  (Id. at 7.)

The record from the state courts does not disclose whether the prosecutor knew about the internal police investigations into Detective Jackson's conduct.  It does not matter if he lacked knowledge, for the Supreme Court held in Giglio that "whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor." Giglio, 405 U.S. at 154.  Brady held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  "Moreover, the rule encompasses evidence 'known only to police investigators and not to the prosecutor.'"  Strickler, 527 U.S. 280-281 (quoting Bagley).  To comply with Brady, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." Kyles, 514 U.S. at 437.

While it could be argued that King's prosecutors did not have the benefit of Bagley, Kyles, and Strickler at the time of trial, the Supreme Court rejected a similar argument in Kyles, where the

59

defendant was convicted in 1984.  The Supreme Court quoted <u>Giglio</u>'s observation that "'procedures and regulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it.'"  <u>Kyles</u>, 514 U.S. at 438 (quoting <u>Giglio</u> at 154.)  Carrying the point further, the Court stated:

> Since, then, the prosecutor has the means to discharge the government's <u>Brady</u> responsibility if he will, any argument for excusing the prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials.

<u>Id.</u>

In <u>Banks</u> the Supreme Court reiterated the three components of a <u>Brady</u> claim: "'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'"  <u>Banks</u>, 540 U.S. at 691 (quoting <u>Strickler</u>, 527 U.S. at 281-282).  Under <u>Kyles</u>, 514 U.S. at 435, the materiality standard for a <u>Brady</u> claim "is met when 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'"  Put succinctly, King must show a reasonable probability of a different result.  <u>Id.</u>

The "cause and prejudice" inquiry thus parallels two of the three components of the alleged <u>Brady</u> violation itself.  <u>Banks</u>, 540 U.S. at 691.  The Supreme Court instructs:

60

> Corresponding to the second <u>Brady</u> component (evidence
> suppressed by the State), a petitioner shows "cause" when
> the reason for his failure to develop facts in state
> court proceedings was the State's suppression of the
> relevant evidence; coincident with the third <u>Brady</u>
> component . . . , prejudice within the compass of the
> "cause and prejudice" requirement exists when the
> suppressed evidence is "material" for <u>Brady</u> purposes.

<u>Id.</u> (citing <u>Strickler</u>). As in <u>Banks</u>, the suppressed impeachment evidence that would have supported a challenge to Detective Jackson's credibility qualifies as evidence advantageous to King, meeting the first component of the <u>Brady</u> claim. <u>See</u> <u>id.</u> "Thus, if [King] succeeds in demonstrating 'cause and prejudice,' he will at the same time succeed in establishing the elements" of his <u>Brady</u> claim. <u>Id.</u>

In both <u>Banks</u> and <u>Strickler</u>, the petitioners made an adequate showing of "cause" because "'(a) the prosecution withheld exculpatory evidence; (b) petitioner reasonably relied on the prosecution's open file policy as fulfilling the prosecution's duty to disclose such evidence; and (c) the [State] confirmed petitioner's reliance on the open file policy by asserting during state habeas proceedings that petitioner had already received everything known to the government.'" <u>Banks</u>, 540 U.S. at 692-693 (quoting <u>Strickler</u>, 527 U.S. at 289).

Although this case is not exactly on all fours with <u>Banks</u>, it is quite similar. The State did not disclose the evidence of Detective Jackson's misdeeds even though King specifically requested <u>Brady</u> material twice during the pretrial motion hearing. Two statements made by the prosecutor during that hearing indicated

61

confirmation that the State believed it was turning over all that it was required by law to disclose. This is evident first in the prosecutor's question to defense counsel: "[W]hat matters did we not cover the other day that you think that we still have?" and later, the prosecutor's remark, "here is all that I have that was provided by the detective," a comment made as he turned over requested witness statements he did not believe the defense was entitled to receive. While the prosecutor's second statement is not precisely equivalent to saying, "you have everything I am supposed to give you," defense counsel reasonably relied on the State's representations before the trial judge that it had turned over all requested discovery. Counsel cannot be faulted for that reliance. See Banks, 540 U.S. at 694. All citizens presume that public officials properly discharge their duties, Bracy v. Gramley, 520 U.S. 899, 909 (1997), and courts, litigants, and juries properly anticipate that obligations "plainly rest[ing] upon the prosecuting attorney[] will be faithfully observed.'" Banks, 540 U.S. at 696 (quoting Berger v. United States, 295 U.S. 78, 88 (1935)).

In his second post-conviction motion, King raised as one ground for relief that, before, during and after the trial, the "State failed to disclose evidence to which the accused was entitled at either the guilt or penalty phase of the trial." (Addendum No. 14, Petition at 6.) In response to the petition, the State denied the claim. (Id. at 10.) Thus, as in Banks, 540 U.S. at 694, the State re-confirmed King's reliance on the prosecution's

62

representation that it had fully disclosed all relevant information.

King and his counsel were not required to search for suspected impeachment evidence, nor were they charged with the burden to ask the trial and post-conviction courts for a court-appointed investigator to find <u>Brady</u> evidence. <u>Id.</u> at 695-696. Counsel on King's second post-conviction petition reviewed the State's file and learned of one discovery violation, but apparently counsel did not find any hint of the <u>Brady/Giglio</u> evidence now at issue. Counsel argued Jackson's character testimony should have been offset by character witnesses in King's favor, but counsel did not have the necessary information to make a <u>Brady/Giglio</u> argument. (Addendum No. 19, Post-conviction Tr. at 44-50, 63-65.)

The State called Detective Jackson as a witness in both the guilt and sentencing phases of trial. <u>See</u> <u>id.</u> at 698. It is beyond doubt that disclosure of the impeachment evidence would have been helpful to King's defense. <u>See</u> <u>id.</u> at 691. The Court concludes King has shown cause for failing to present evidence in state court to substantiate his <u>Brady/Giglio</u> claim. <u>See</u> <u>id.</u>; <u>Amadeo v. Zant</u>, 486 U.S. 214 (1988); <u>Hutchison</u>, 303 F.3d at 741; <u>Jamison v. Collins</u>, 291 F.3d 380, 388 (6th Cir. 2002). <u>Cf.</u> <u>Harbison v. Bell</u>, 408 F.3d 823, 830-836 (6th Cir. 2005) (holding petitioner failed to show cause and prejudice distinguishing <u>Banks</u> because it involved intentional concealment of evidence).

The Court turns, then, to the prejudice inquiry. With regard to the guilt phase, the Court does not believe there is a

63

reasonable probability that use of the impeachment evidence on cross-examination of Detective Jackson would have led to a different verdict. See Kyles, 514 U.S. at 435. Detective Jackson placed before the jury the evidence of King's arrest and the recovery of the weapon, the car, and the car keys. While Jackson was an important link in the chain of custody of the physical evidence and he completed the story of the crime, his role was by no means pivotal. The witnesses present inside the tavern during the robbery and shooting were far more critical in carrying the State's burden to prove beyond a reasonable doubt that King committed felony murder.

The prejudice to King emanating from Jackson's role as a character witness at the penalty phase is another matter altogether. Jackson was the only witness the State called in the penalty phase. The sole purpose for calling him was to paint King as a person not to be believed. Coming from a law enforcement officer, this was calamitous to King, who had just testified poorly in his own behalf as a result of counsel's misguided effort to present a mitigation case, as discussed above. Like the witness in Banks, 540 U.S. at 672, Jackson "was the centerpiece of [the] prosecution's penalty-phase case[,]" and his deprecating testimony helped seal King's fate. During closing argument, the State effectively turned Jackson's testimony to its advantage.

To comply with Giglio the State had a duty to inquire if the Chattanooga police department possessed any evidence that would qualify as impeachment evidence of Detective Jackson. The State

64

apparently did not discharge that duty. Years later, King unearthed the available evidence and presented it to this Court. The State has not had an opportunity to respond to the <u>Brady</u> evidence submitted by King. For this reason, the Court will address this issue at the evidentiary hearing as well. <u>See</u> <u>Sawyer</u>, 299 F.3d at 610.

The question will be whether, in the absence of the evidence, King received a fair sentencing hearing, understood as a proceeding resulting in a verdict worthy of confidence. <u>See</u> <u>Kyles</u>, 514 U.S. at 434. If counsel had been able to impeach Jackson as a police officer unworthy of belief, the jury might have reached a different opinion of King's truth and veracity. <u>See</u> <u>Banks</u>, 540 U.S. at 703; <u>Castleberry v. Brigano</u>, 349 F.3d 286, 293 (6th Cir. 2003) (petitioner entitled to habeas relief under <u>Brady</u> where withheld evidence would have undermined credibility of prosecution's key witness).

The Court finds that discovery and an evidentiary hearing are not necessary to explore King's <u>Brady</u> claims that the State failed to disclose evidence of Lockridge's criminal wrongdoing and gun ownership, ballistics evidence, King's mental disturbance, juror misconduct, and benefits granted to the State's trial witnesses. <u>See</u> <u>United States v. Agurs</u>, 427 U.S. 97, 114 (1976). King did not make any effort to raise these <u>Brady</u> claims in state court. He brought out at trial the suspicion that Lockridge's tavern might be a place for criminal activity and he presented Carolyn Gunn's testimony that Lockridge owned a gun. King knew the State

65

conducted ballistics tests on the recovered weapon because he cross-examined the State's ballistics expert at trial. He did not ask the witness about the trace on the gun, and he does not now describe any particular discovery documents he believes the State withheld concerning any of the categories of evidence he names.

Because King cannot show cause and prejudice for his failure to raise these Brady claims in state court, they are procedurally defaulted. Any attempt to overcome procedural default through ineffective assistance of counsel must fail because King did not raise any related ineffective assistance of counsel claims in state court. See Burroughs v. Makowski, 411 F.3d 665, 668 (6th Cir. 2005) ("To constitute cause, that ineffectiveness must itself amount to a violation of the Sixth Amendment, and therefore must be both exhausted and not procedurally defaulted.") Even if the claims were not procedurally defaulted, King has not shown good cause for conducting discovery. Rule 6 of the Rules Governing Section 2254 Cases.

### ¶ 10 - Failure to maintain jury sequestration

Tennessee law required sequestration of the jury in this capital case, Tenn. Code Ann. § 40-18-116 (1982 Repl), and the trial court ordered jury sequestration. At the hearing on the motions for new trial, co-defendant Davis's counsel informed the trial court that defense counsel observed the jury did not remain sequestered when traveling to and from the courthouse, and he received a report that on Friday or Saturday morning of trial, one juror stopped at a beer store en route to the courthouse. Counsel

66

stated he had no proof that anything improper occurred, but he felt obligated to tell the court what he knew. When the court questioned further, counsel for Davis and King reported they observed the jurors leaving the courthouse and going to their cars without supervision late on Friday evening at the conclusion of the guilt phase of trial, and Davis's counsel saw the jurors approaching the courthouse from different directions on Saturday morning, when King's sentencing hearing was to take place. King's counsel asked the court to inquire into the matter. (Addendum No. 2, Trial Tr. at 720-724.)

Following a recess, the prosecutor informed the court he had spoken with one of the court officers who guarded the jury, Walter Timmons. The fourteen jurors were sequestered at the Holiday Inn after their selection as jurors through completion of King's sentencing hearing. Two guards were assigned to supervise them. The first night the jurors were allowed to move their vehicles from the courthouse to the Holiday Inn. Because it was impractical to transport sixteen persons in two vehicles so there would be a guard present at all times, four vehicles were used thereafter, with guards in two of them. All four cars left the motel at the same time and drove to a meeting place near the courthouse. The cars were not able to remain together at all times. The guards admonished the jurors not to stop or deviate from the route and gave the jurors directions to take the most direct route. The cars arrived at the meeting place within three to five minutes of each other. From there, the jurors walked to the courthouse as a group.

67

Each evening the practice was reversed. This continued through the guilt phase of trial. On Saturday morning, believing it was the last day of trial, the guards allowed the jurors to move their personal cars to the vicinity of the courthouse so they would have transportation after completing their duties. Each juror then walked to the courthouse. (<u>Id.</u> at 727-730.)

The trial court subpoenaed each juror and held a hearing to determine if there had been any improper juror contact on the morning of King's sentencing hearing. Because there were no allegations of improper juror conduct earlier in the week, the trial court refused to ask, and refused to allow counsel to ask, any questions about the jury's sequestration during the guilt phase. Thus, Davis's counsel did not participate in the special hearing.

King tendered the affidavit of Timmons, which was consistent with the information the State earlier relayed to the trial court. The State did not wish to cross-examine Timmons. (<u>Id.</u> at 738, 778.) King's counsel asked permission to inquire whether the jurors had discussed punishment before the sentencing hearing, but the court refused to allow counsel to "go on a fishing expedition with this jury or any other jury." (<u>Id.</u> at 742.)

The court questioned each juror individually in the presence of counsel for the parties, and then allowed counsel to ask questions. (<u>Id.</u> at 737-778.) The jurors testified consistently that, on the morning of the sentencing hearing, the guards permitted them to drive their own vehicles from the motel to the

vicinity of the courthouse so they could return home when the sentencing hearing concluded. Some jurors rode in vehicles together. Two jurors who did so, James Morrison and Doyle McKee, stopped at "Jack's Party-Pack" on the way to the courthouse. McKee "went inside to purchase a Sun Drop, and right back out." (Id. at 748.) McKee denied that he spoke to anyone about the case and that anyone tried to talk to him about the case. He stated he based his verdict only on the testimony and instructions. (Id. at 762-763.) King's counsel did not ask Morrison or McKee any questions. The State questioned Morrison, but not McKee or any of the other jurors. (Id. at 749-750, 763.) None of the other jurors stopped on the way to the courthouse. At the request of the State, the court questioned the second guard, James Huey, who provided information similar to that obtained from Timmons. (Id. at 775-778.) At the conclusion of the hearing, the trial court denied King's motion and amended motion for a new trial.

On direct appeal, King contended the trial court erred in refusing to allow counsel to ask the jurors questions about their sequestration during the guilt phase of trial. He also asserted that, once he proved the jurors separated during the trial, the burden shifted to the State to prove that no prejudice occurred, citing Gonzales v. State, 593 S.W.2d 288 (Tenn. 1980), but the State did not put on any proof other than to ask questions of one juror. (Addendum No. 4, Appellant's Brief at 33-35.)

In response, the Tennessee Supreme Court erroneously stated that the trial judge did not prevent King from examining the jurors

69

about events that may have occurred during the guilt phase. King, 694 S.W.2d at 947. The trial court certainly did prevent such questioning, but only because defense counsel had not raised any allegations of improper juror contact during that period. The court rejected King's claim because the jurors testified positively under extensive questioning by the court that there had been no improper outside contact or interference with them on the morning of King's sentencing hearing. Id. The court observed that King's counsel did not ask any questions of the jurors at the hearing, even when given the opportunity. Id.

The State contends this claim is not cognizable in federal habeas because it arises from state statute and not the federal Constitution. The right to a jury free of improper outside influence and prejudice is, however, grounded in the federal Constitution, see Irvin v. Dowd, 366 U.S. 717, 722-724 (1961), and thus, the claim is cognizable in this habeas proceeding.

Two cases King cites are distinguishable. In Turner v. Louisiana, 379 U.S. 466 (1965), two court officers assigned to guard the jury were also trial witnesses. A similar situation did not occur here. In Estes v. Texas, 381 U.S. 532 (1965), the Supreme Court overturned the conviction because of improper and prejudicial television taping of the trial and its use before a audience. Nothing like that happened here.

While King's case may have attracted media attention, King did not ask the jurors any questions about whether they listened to radio news reports while traveling to and from the courthouse.

70

Counsel was not deprived of the chance to make a record, as King contends. Each juror, in response to the court's questioning, testified that nothing influenced the verdict except the evidence and the jury instructions.

King's assertion that a juror may have consumed alcohol is answered by the record. While McKee and Morrison violated their instructions not to stop on the way to the courthouse, McKee bought a Sun Drop, not a beer, at Jack's Party Pack. He assured the court that no improper influences affected his verdict.

King fails to show that the Tennessee Supreme Court's decision finding no error under these facts is contrary to, or an unreasonable application of, clearly established Supreme Court law. 28 U.S.C. § 2254(d)(1); Williams, 529 U.S. at 405. The claim is denied.

### ¶ 12 - Exclusion of King's statement to police

King's statement to Detective Walter Hall following his arrest was similar to his trial testimony that he scuffled with Lockridge and the shooting was accidental. (Docket Entry No. 71-2 at 1.) Over the State's objection, King attempted to introduce his statement during the cross-examination of Detective Hall. The trial court excluded the statement as hearsay. (Addendum No. 2, Trial Tr. at 350.)

King raised trial error on direct appeal and contended he was prejudiced by exclusion of the statement because he was forced to testify and reveal his felony criminal history to the jury. The Tennessee Supreme Court held the pretrial statement to the police

71

was a self-serving and unreliable hearsay statement which the trial court properly excluded.  <u>King</u>, 694 S.W.2d at 944-945 (relying on <u>Hall v. State</u>, 552 S.W.2d 417, 418 (Tenn. Crim. App. 1977), and *Wharton's Criminal Evidence*, § 303 (13th ed.)).  Moreover, the court ruled, the State did not attempt to establish any impermissible inference concerning King's right to remain silent when the State omitted any mention of the pretrial statement during the direct examination of Detective Hall.  <u>Id.</u>

The State now agrees that the cases King cited in his brief on direct appeal relied on the Fifth and Sixth Amendments and King raises a constitutional claim.  The State properly contends, however, that the Tennessee Supreme Court's ruling was correct as a matter of law and King fails to show that the ruling is contrary to, or an unreasonable application of, clearly established Supreme Court law.  28 U.S.C. § 2254(d)(1); <u>Williams</u>, 529 U.S. at 405.  King did not rely on the Eighth and Fourteenth Amendments in state court as he does here, and thus, those claims are procedurally defaulted without any showing of cause and prejudice to excuse the default.  The claim is denied.

#### ¶ 13 - Exclusion of Davis's statement to police

Following his arrest, co-defendant Davis gave a statement to Lt. Detective Albert Lentz confirming King's account of an accidental shooting.  (Docket Entry No. 71-2 at 2.)  King attempted to introduce the statement as exculpatory evidence during the cross-examination of Detective Lentz.  (Addendum No. 2, Trial Tr.

72

at 364-365.)  The trial court excluded the statement as unsworn hearsay.  (Id. at 365.)

On direct appeal, the Tennessee Supreme Court ruled the trial court did not err in refusing to admit the statement because it constituted hearsay when proffered by King during cross-examination of the police officer who took the statement.  King, 694 S.W.2d at 945.  The statement did not incriminate Davis and it was not offered as a declaration against the penal interest of Davis, which would have allowed its admission under a hearsay exception.  Id. The court held the statement lacked inherent indicia of trustworthiness and further noted the State could not cross-examine Davis about the statement unless he voluntarily took the stand, which he chose not to do.  Further, the State could not have offered any portion of the Davis statement that incriminated King without creating a problem under Bruton v. United States, 391 U.S. 123 (1968).  Id.

The State now agrees that the cases King cited in his brief on direct appeal relied on the Fifth and Sixth Amendments and King raises a constitutional claim.  The State properly contends, however, that the Tennessee Supreme Court's ruling was correct as a matter of law and King fails to show that the ruling is contrary to, or an unreasonable application of, clearly established Supreme Court law.  28 U.S.C. § 2254(d)(1); Williams, 529 U.S. at 405. King did not rely on the Eighth and Fourteenth Amendments in state court as he does here, and thus, those claims are procedurally

73

defaulted without any showing of cause and prejudice to excuse the default. The claim is denied.

### ¶ 14 - *Limitation on cross-examination of Carolyn Gunn*

King asserted on direct appeal that the trial court incorrectly sustained the State's objection on cross-examination of witness Carolyn Gunn about her affair with Mark Lockridge. King wanted to elicit testimony of the year-long personal relationship to show Gunn spent a good deal of time with Lockridge at the tavern, which allowed her to observe him with the pistol he allegedly owned and kept in a bank bag by the cash register. The testimony was offered to rebut an inference drawn by the State that Lockridge's wife and brother were in a better position to know whether Lockridge owned a gun.

The Tennessee Supreme Court upheld the trial court's limitation on Gunn's testimony. King, 694 S.W.2d at 946. King received the benefit of Gunn's favorable trial testimony that she observed Lockridge with a gun at the tavern, and the evidence of the illicit relationship was thus irrelevant. Id. The court also ruled exclusion of the evidence did not prejudice King, nor could it have been reasonably calculated to enhance Gunn's credibility, as King contended. Id. at 946.

The State agrees that King raised this issue as a Sixth Amendment claim. The State properly contends there was no error in the Tennessee Supreme Court's ruling. King fails to show that the decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. 28 U.S.C. § 2254(d)(1); Williams,

74

529 U.S. at 405. King did not rely on the Fourteenth Amendment in state court as he does here, and thus, that claim is procedurally defaulted without any showing of cause and prejudice to excuse the default. The claim is denied.

### ¶¶ 15, 16, 17 – Felony murder and proof of malice

King alleges that the trial court's instructions on the offense of felony murder were unconstitutional in violation of the Sixth, Eighth and Fourteenth Amendments and Sandstrom v. Montana, 442 U.S. 510 (1979), because the jury could return a verdict on felony murder without finding malice; the jury instructions presumed malice from the mere fact of a killing and the use of a deadly weapon in violation of the Sixth and Fourteenth Amendments and Sandstrom; and the felony murder statute unconstitutionally shifted the burden of proof to King to produce evidence to avoid conviction, in violation of the Sixth, Eighth, and Fourteenth Amendments. The State agrees that King exhausted the first claim in state court only as a violation of the Fourteenth Amendment, but asserts King's remaining claims were procedurally defaulted. (Docket Entry No. 63, Memorandum at 17.)

The Court agrees with the State that King did not exhaust the first issue in state court as a violation of the Sixth and Eighth Amendments, and therefore, any reliance on those provisions is procedurally defaulted because there is no showing of cause and prejudice to excuse the default. However, King raised on direct appeal from denial of his second post-conviction petition the claim that the felony murder statute was unconstitutional. (Addendum

75

No. 20, Appellant's Brief at 42-47.) The Tennessee Court of Criminal Appeals held the claim had been "previously determined" on direct appeal, and notwithstanding the previous determination, noted the Tennessee Supreme Court had consistently upheld the felony murder statute. King 1997 WL 59464 at *3. Therefore, the Court will consider the issue on the merits, along with the claims of instructional error.

At the time of trial in 1982, Tennessee law provided: "If any person of sound memory and discretion, unlawfully kills any reasonable creature in being, and under the peace of the state, with malice aforethought, either express or implied, such person shall be guilty of murder." Tenn. Code Ann. § 39-2-201 (1979). Tennessee divided murder into first and second degree, and defined first-degree murder in pertinent part as follows:

39-2-202. First-degree murder.

(a) Every murder perpetrated by means of poison, lying in wait, or by other kind of willful, deliberate, malicious, and premeditated killing, or committed in the perpetration of, or attempt to perpetrate, any . . . robbery . . ., is murder in the first degree.

The trial court instructed the jury in part as follows:

If you should find beyond a reasonable doubt that the defendant killed the deceased during the perpetration of, or during an attempt to perpetrate robbery as alleged, and that the defendant specifically intended to commit the alleged robbery, it is not necessary that the state prove an intention to kill, or that the alleged killing was done willfully, deliberately, with premeditation, and with malice.

(Addendum No. 2, Trial Tr. at 564-565.)

76

On direct appeal, King contended the trial court should not have given the instruction because it relieved the State of its burden to prove malice, an essential element of the crime of first-degree felony murder. King asserted that the General Assembly significantly changed the law in 1977 when it re-enacted the felony murder statute and replaced "killing" with "murder," such that every murder, rather than every killing, committed during the perpetration of an enumerated felony constituted first-degree murder. (Addendum No. 4, Brief at 21-27.) The Tennessee Supreme Court rejected King's position, stating:

> We do not consider that the change in statutory language occurring in 1977 had the effect of abolishing the felony-murder rule, nor does felony-murder require proof of malice. Were that required, however, it might have been sufficiently shown in this case by statements attributed to appellant that he intended to kill the victim. There was also evidence that he threatened to kill the other persons in the tavern and was restrained from doing so by his codefendant.

King, 694 S.W.2d at 946 (relying on State v. Johnson, 661 S.W.2d 854, 860-861 (Tenn. 1983), and Tosh v. State, 527 S.W.2d 146, 148 (Tenn. Crim. App. 1975)).

Under Tennessee law at the time of trial, murder in the first degree was shown by proof of "premeditated, willful, deliberate and malicious homicide" **or** by proof of a killing committed in the perpetration of certain specified felonies, including robbery. State v. Smith, 695 S.W.2d 954, 957 (Tenn. 1985); State v. McKay, 680 S.W.2d 447 (Tenn. 1984); Claiborne v. State, 555 S.W.2d 414, 418-419 (Tenn. Crim. App. 1977); Abdus-Samad v. Bell, — F.3d —, 2005 WL 2036155, No. 03-6404, slip op. at 6 (6th Cir. Aug. 25,

77

2005).  The prosecution was not required to prove malice as an element of first-degree murder.  Rather, where the offense was committed in the perpetration of a robbery, malice was implied by the statute.  <u>Middlebrooks</u>, 840 S.W.2d at 336; <u>State v. Irick</u>, 762 S.W.2d 121, 128 (Tenn. 1988); <u>Tosh</u>, 527 S.W.2d at 148; <u>Smith v. State</u>, 354 S.W.2d 450, 451-452 (Tenn. 1961); <u>Farmer v. State</u>, 296 S.W.2d 879, 883 (1956).  Based on these authorities, the Tennessee Court of Criminal Appeals rejected King's claim that the felony murder statute was unconstitutional.  <u>King</u>, 1997 WL 59464 at *3.

In <u>Workman</u>, 178 F.3d at 777, the Sixth Circuit rejected an identical challenge to the felony murder jury instruction. Characterizing Workman's argument as "interesting," the Sixth Circuit nonetheless found it to be without merit in light of Tennessee law at the time.  <u>Id.</u>

In <u>Davis v. State</u>, 856 F.2d 35, 36 (6th Cir. 1988), the Sixth Circuit considered the federal habeas case brought by King's accomplice in the Lockridge murder.  The court ruled that Davis's "participation in the felony during which the murder [was] committed by another participant [King] is a substitute for the elements of intent to kill and malice which otherwise must normally be proved in a murder case."  <u>Id.</u>  Because the trial evidence confirmed that King "intentionally killed" Lockridge, Davis's conviction for second-degree murder was, in actuality, "'predicated on facts showing felony murder.  And as we have previously said, the element of malice is automatically supplied in

78

felony-murder cases and need not be proved by the state.'" Id.
(quoted case omitted).

King cites Sandstrom, Caldwell v. Bell, 288 F.3d 838 (6th Cir.
2002), and Houston v. Dutton, 50 F.3d 381 (6th Cir. 1995), in
support of his claim that the court's instructions relieved the
State of its burden to prove malice. The Supreme Court has held
that instructing the jury to presume malice from use of a deadly
weapon is a Fourteenth Amendment due process violation because it
shifts the burden to the defendant to disprove malice. Yates v.
Evatt, 500 U.S. 391, 401-402 (1991); Francis v. Franklin, 471 U.S.
307, 317 (1985). Following these cases, the Sixth Circuit held in
Houston, 50 F.3d at 381, that instructing the jury to presume
malice from the mere fact of a killing or the use of a deadly
weapon eviscerated the defendant's defense theory of an accidental
shooting. Id. at 386. The second-degree murder instruction given
in this case included language similar to the instruction given in
Houston, and was unconstitutional for the same reason.

When faced with a Sandstrom error, the Court must review the
entire case under the harmless-error standard of Brecht v.
Abrahamson, 507 U.S. 619 (1993), and O'Neal v. McAninch, 513 U.S.
432 (1995). Caldwell, 288 F.3d at 842. An error is not to be
deemed harmless if it had a "substantial or injurious effect or
influence in determining the jury's verdict." Id. If this Court
has "grave doubt" about the harmlessness of the error, the writ
should issue. Id.; Abdur'Rahman v. Bell, 226 F.3d 696, 707 (6th
Cir. 2000). But if the Court is sure the error did not influence

79

the jury, or had but very slight effect, the verdict must stand. Id. (explaining applicable standard from Kotteakos v. United States, 328 U.S. 750 (1946), discussed in Brecht and O'Neal).

The Court is confident the unconstitutional second-degree murder instruction did not influence the jury or, if it did, that the effect was very slight. The trial court properly instructed the jury on first-degree felony murder under Tennessee law as it existed at that time. As previously explained, the jury was told that if it found beyond a reasonable doubt that King killed Lockridge during the perpetration of, or an attempt to perpetrate robbery, it was not necessary for the State to prove his intention to kill, or that the killing was done willfully, deliberately, with premeditation, and with malice. The court then instructed on the lesser-included offenses of second-degree murder, which included the Sandstrom error, and voluntary and involuntary manslaughter.

The Sixth Circuit has suggested that the State proved King acted intentionally when he murdered Lockridge, Davis, 856 F.2d at 36, and the Tennessee Supreme Court pointed to the State's proof that King acted with malice because of his statement that he intended to kill the victim and because he threatened others with harm. King, 694 S.W.2d at 946. Because the State introduced proof of King's intentional act with malice, and the jury was entitled to discredit King's contention that the shooting was accidental, the Court does not have "grave doubt" that the instructional error had a "substantial or injurious effect or influence in determining the jury's verdict." Caldwell, 288 F.3d at 842. Therefore, the Court

80

concludes habeas relief on these claims is unwarranted because King has not shown that the decisions of the Tennessee Supreme Court and the Tennessee Court of Criminal Appeals were contrary to, or involved an unreasonable application of, clearly established Supreme Court law. 28 U.S.C. § 2254(d)(1); <u>Williams</u>, 529 U.S. at 405.

### ¶ 25 - <u>*Middlebrooks*</u> *error*

To review, <u>Middlebrooks</u> held that use of the felony murder aggravating circumstance duplicated the elements of the underlying felony murder and failed to narrow the class of death-eligible murderers. <u>Middlebrooks</u>, 840 S.W.2d at 323. The Tennessee Supreme Court sharply divided 3-2 on the issue of whether the <u>Middlebrooks</u> error in King's case constituted harmless error. King now challenges the harmless error analysis as contrary to, and as an unreasonable application of, <u>Chapman v. California</u>, 386 U.S. 18, 24 (1967).

King's contention is foreclosed by the recent decision in <u>Abdus-Samad</u>, — F.3d —, 2005 WL 2036155, No. 03-6404, slip. op. (6th Cir. Aug. 25, 2005). In that case, the Sixth Circuit concluded there is no meaningful difference between the harmless error standards applied in <u>Chapman</u> and <u>State v. Howell</u>, 868 S.W.2d 238 (Tenn. 1993). "[R]egardless of whether other harmless error formulations would satisfy the Eighth Amendment, the Tennessee Supreme Court's harmless error analysis" as adopted in <u>Howell</u> is not "contrary to <u>Chapman</u> or other clearly established Supreme Court precedent." <u>Abdus-Samad</u>, slip op. at 4.

81

Like Abdus-Samad, however, King asserts the Tennessee Supreme Court's decision in his case resulted from an unreasonable application of the Howell standard. Under AEDPA, this Court's review is confined to whether the Tennessee Supreme Court's harmless error analysis was an unreasonable application of clearly established Supreme Court precedent. Abdus-Samad, slip op. at 5.

Because Tennessee is a weighing state, invalidation of the felony murder aggravating circumstance "removed a mass from one side of the scale. There is no way to know if the jury's analysis [balancing] the aggravating and mitigating circumstances . . . would have reached the same result even without the invalid factor." Coe v. Bell, 161 F.3d 320, 334 (6th Cir. 1998) (citing Stringer v. Black, 503 U.S. 222, 232 (1992)).

Nonetheless, the state appellate court itself may reweigh the aggravating and mitigating circumstances or conduct harmless error review. Clemons v. Mississippi, 494 U.S. 738, 750-753 (1990). In reviewing the state appellate court's analysis, this Court cannot reweigh the aggravating and mitigating factors; rather, the Court must ensure only that the Tennessee Supreme Court's harmless error review was not unreasonable. Abdus-Samad, slip op. at 5; Coe, 161 F.3d at 334. King must show that the Tennessee Supreme Court applied federal law to the facts of his case in an objectively unreasonable manner. Abdus-Samad, slip op. at 5 (citing Bell v. Cone, 535 U.S. 685 (2002)).

The Tennessee Supreme Court reviewed King's trial record and considered the primary Howell factors: (1) the strength of the two

82

remaining aggravating circumstances; (2) the prosecutor's arguments during the sentencing phase; (3) the evidence admitted to establish the invalid felony murder aggravating circumstance; and (4) the nature, quality and strength of mitigating factors. King, 992 S.W.2d at 948-951. The five members of the court came to different conclusions, however, about whether the Middlebrooks error was harmless. Although the two dissenters chastised the majority for misapplying Chapman and Howell, their disagreement essentially boiled down to a difference of opinion about whether the strength, qualitative nature, substance, persuasiveness, and proof supporting the two remaining aggravating circumstances supported the jury's imposition of the death penalty. King, 992 S.W.2d at 955-959.

The majority concluded that the jury's consideration of the invalid felony murder aggravating circumstance was harmless error "due to the strength of the remaining valid aggravating circumstances and the relative weakness or absence of any mitigating circumstances." King, 992 S.W.2d at 947. Reviewing the same evidence, the dissenters concluded re-sentencing was necessary because the court had previously decided in King's direct appeal that the prior violent felony aggravating circumstance was "marginal," King, 694 S.W.2d at 944, and the facts of King's case differed substantially from other, more egregious cases in which the "great risk of death" aggravating circumstance was upheld. King, 992 S.W.2d at 956-958.

If this Court were writing on a clean slate, the Court might be inclined to join the dissenters in view of the majority's myopic

83

reading of the trial record. For instance, the majority observed that King shot Lockridge "without provocation" while "he was lying on the floor," id. at 947, yet Daniel Harris testified Lockridge jumped up and slammed Davis into the cash register when Davis tried to steal money, and King then fired the fatal shot. The trial testimony paints a somewhat different portrait than the execution-style murder that may come to mind when reading the Tennessee Supreme Court's account of the offense.

The majority was troubled that King did not accept responsibility for his actions, he alleged the shooting was accidental, and he attempted to justify the killing because of Lockridge's refusal to pay him for merchandise. Id. at 947-948. King had a constitutional right to present a defense, however, and his defense was that Lockridge failed to pay him, an argument ensued, Lockridge pulled a gun, and the shooting was accidental. Having considered the credibility of the witnesses, the jury rejected King's defense. A defendant who insists he did not commit the crime may not express remorse.

In considering the content of closing argument in the penalty phase, the majority disagreed with King's assessment that the prosecutor put too much emphasis on the felony murder aggravating circumstance. Viewing the argument as a whole, the majority believed the State did not overemphasize the invalid aggravating circumstance. Id. at 951. The dissenters may have the better view on this issue because the prosecutor repeatedly directed the jury's attention to the felony murder and the duplicative aggravating

84

circumstance, exhorting the jury to impose death because it had already found King guilty of felony murder. The dissent outlines the State's arguments in this regard. Id. at 957-958.

On the other hand, certain points made by the majority are accurate and reasonable considerations. The State did not introduce any additional evidence during the sentencing phase to support the felony murder aggravating circumstance. Consequently, the jury heard evidence of the felony murder that it was entitled to hear in the guilt phase. See Howell, 868 S.W.2d at 261 ("[A]n aggravating factor which duplicates the elements of the underlying crime has less relative tendency to prejudicially affect the sentence imposed than invalid aggravating factors which interject inadmissible evidence into the sentencing calculus, or which require the sentencing jury to draw additional conclusions from the guilt phase evidence.") The State's witnesses testified contrary to King. King, 992 S.W.2d at 947-948. During and after the robbery, King made threats to other persons, and he conceded that he had five prior felony convictions, including kidnaping and attempted robbery, as well as a history of violating probation. He admitted he was on probation when he shot Lockridge.[11]

The majority was not impressed with King's contentions that his prior crimes were not egregious, the kidnaping conviction resulted from a minor domestic dispute, his role in the attempted

---

[11]The effect of this testimony could have been offset, however, if trial counsel had introduced the available mitigating evidence, as previously discussed.

robbery was minimal, and he received relatively light sentences on both convictions.[12] Id. at 949. The fact that the victim of the kidnaping was King's spouse did not, in the court's view, "decrease the magnitude or substance and persuasiveness of that crime[]" because "[d]omestic violence is a serious problem plaguing our society that should not be minimized." Id. at 950. Further, the court reasoned, the fact that King's attempted robbery conviction stemmed from an incident involving three other individuals did not minimize the seriousness of his conviction. Id. Finally, the court stated:

> The defendant's statements are best categorized as mitigating proof that the jury could have used to weigh against its findings of the valid aggravating circumstances. The conduct underlying the defendant's prior convictions may be less egregious than the conduct underlying the prior convictions of other defendants who have appeared before this Court. [footnote omitted] We emphasize, however, that Howell does not require us to conduct a comparative review in determining the substance and persuasiveness of the remaining valid aggravating circumstances. . . . We have followed the analysis delineated in Howell and conclude that, in this case, the prior violent felony conviction aggravating circumstance is both objectively reliable and amply supported by the proof.

Id. at 950.

With regard to the aggravating circumstance that King's conduct "created a great risk of death to two (2) or more persons, other than the victim murdered, during the act of murder[,]" Tenn. Code Ann. § 39-2-203(i)(3) (1982), the majority focused on King's

---

[12]King received a sentence of two years in the state penitentiary and ten years probation on the kidnaping conviction. He received nine months probation on the attempted robbery conviction. King, 992 S.W.2d at 949 n.2.

86

conduct in entering the tavern, firing a shot into the ceiling, and ordering patrons to the floor at gunpoint. After fatally wounding Lockridge with the second shot, King threatened to kill others in the tavern and forced another person to get down on the ground outside the bar. "While no additional victims were shot, the threat to their lives was very real. We again conclude that this second remaining valid aggravating circumstance is clearly supported by objectively reliable proof." King, 992 S.W.2d at 951.

The majority found "little or no mitigating proof upon careful examination of the record[,]" King, 992 S.W.2d at 951, an observation previously made by the Tennessee Supreme Court in ruling on King's direct appeal. King, 694 S.W.2d at 944 ("Very little was offered by way of mitigating circumstances[.]")).[13] According to the majority, King appeared to be "an extremely poor candidate for rehabilitation" considering his prior criminal record, his history of violating probation, his blaming of the victim, and his lack of remorse. Id. Although King contends the Tennessee Supreme Court failed to mention the mitigating evidence that was presented, the majority did address what little mitigating evidence was produced.

A very close question is presented on the Middlebrooks issue. Taking the majority's harmless error analysis as a whole, however, it was not unreasonable for the Tennessee Supreme Court to

_____

[13]Again, as previously discussed, the lack of mitigating evidence is attributable to the ineffective assistance of trial counsel.

87

determine that the jury's verdict in this case would have been the same had it not considered the felony murder aggravating circumstance.[14]   See Abdus-Samad, slip op. at 7.   "The jury's consideration of the improper aggravating factor[s] in this case has not so infected the balancing process such that it is constitutionally impermissible for the Tennessee Supreme Court to let the sentence stand[,]" even in the face of Middlebrooks error. Id.

### ¶ 34 - *Arbitrary imposition of death penalty*

Without elaboration, King asserts in his petition that "the death penalty in the State of Tennessee, at the time that Tommy King was sentenced, was imposed in an arbitrary, capricious and irrational manner" in violation of the Eighth and Fourteenth Amendments.   The State suggests the claim is conclusory and should be denied.   King's brief merely re-states the issue in three lines and does not include any argument. (Docket Entry No. 71 at 156.)

The claim as presented is conclusory and King waived his opportunity to expound upon the claim in this Court.   In any event, the Tennessee Supreme Court briefly addressed a similar issue on direct appeal and rejected it.   King, 694 S.W.2d at 946.   King has not shown that the state court's ruling is contrary to, or an unreasonable application of, clearly established Supreme Court law.

---

[14]As already explained, the Court believes the result may have been different if the jury had heard the mitigating evidence, particularly if the felony murder aggravating circumstance had also been removed from the jury's consideration.

28 U.S.C. § 2254(d)(1); <u>Williams</u>, 529 U.S. at 405.  The claim is denied.

### ¶ 37 – *Inadequate statutory review*

King asserts a liberty interest in the Tennessee Supreme Court's statutorily-mandated review of his death sentence and contends the court's review in his case was inadequately performed. <u>See</u> <u>King</u>, 694 S.W.2d at 947 (reviewing death sentence for arbitrariness and disproportionality).  This claim is not procedurally defaulted, as the State suggests.  However, it is foreclosed by the Sixth Circuit's rejection of the precise issue in <u>Coe</u>, 161 F.3d at 351-352.  Moreover, King does not have an Eighth Amendment right to proportionality review.  <u>Id.</u> (citing <u>Pulley v. Harris</u>, 465 U.S. 37, 44-45 (1984)).  This claim is denied.

### B.  Procedurally Defaulted Issues

The Court agrees with the State that many of the claims King raises in this federal habeas petition were procedurally defaulted in state court.  Those claims are: the jury venire was unconstitutionally empaneled (¶ 7); the prosecutor used peremptory challenges to exclude African American jurors in violation of <u>Swain v. Alabama</u>, 380 U.S. 202 (1965) (¶ 8); the grand jury was unconstitutionally empaneled because women and African Americans were systematically excluded as grand jurors and grand jury forepersons (¶ 9); the murder victim's widow was allowed to sit at the prosecution counsel table, she was introduced to the jury, and she testified for the State (¶ 11); the jury instructions on "reasonable doubt" given at both phases of trial violated due

89

process because they understated the State's burden of proof (¶ 18); the "theory of defense" instruction given at the guilt phase eviscerated the presumption of innocence (¶ 19); a guilt-phase jury instruction improperly injected the issue of sentencing (¶ 20); the evidence was insufficient to support the conviction for felony murder (¶ 21); numerous claims of ineffective assistance of trial and appellate counsel (¶ 23); prosecutorial misconduct during the penalty phase closing argument (¶ 24); the State's improper use of Sgt. James Jackson as a rebuttal witness during the penalty phase because his testimony did not rebut any defense evidence (¶ 26); failure to instruct the jury on the meaning of a life sentence (¶ 27); failure to define mitigating circumstances in the jury instructions during the penalty phase (¶ 28); the death sentence is unconstitutional because it infringes on the fundamental right to life (¶ 29); the death sentence is unconstitutional because there are no standards to guide the jury in imposing it or for conducting proportionality review (¶ 31); the methods of execution, both lethal injection and electrocution, constitute cruel and unusual punishment (¶ 32); the death penalty as applied to King constitutes cruel and unusual punishment because of the length of time he has been incarcerated (¶ 33); the death penalty statute is unconstitutional because it mandates a death sentence if no mitigating circumstances are found (¶ 35); and there is no penological justification for King's execution (¶ 36).

More specifically, to the extent not otherwise addressed in this opinion, the Court finds that King did not present to the

state courts the claims, or subparts of the claims, raised in ¶¶ 8, 9, 11, 19, 20, 21, 23, 24, 26, 28, 31, 32, 33, 35 and 36. Consequently, the unexhausted claims are now barred by the post-conviction statute of limitations, Tenn. Code Ann. § 40-30-102, and they are procedurally defaulted for purposes of federal habeas review. O'Sullivan v. Boerckel, 526 U.S. 838, 848 (1999); Coleman v. Thompson, 501 U.S. 722, 731-732 (1991); Alley v. Bell, 307 F.3d 380, 385-386 (6th Cir. 2002).

In view of this already lengthy opinion, the Court will not discuss certain items of evidence King submitted in this Court in support of these procedurally defaulted claims, even though the Court has carefully reviewed King's evidentiary submission in its entirety. Additional comments are in order, however, to explain why the Court finds that claims raised before the state courts are procedurally defaulted and why King has not shown cause and prejudice or a miscarriage of justice to overcome the procedural defaults. The Court will also give its reasons for concluding that King's claim of an ineffective post-conviction remedy is not cognizable in this federal habeas action (¶ 30), and that there is no basis to find cumulative error (¶ 38.)

### ¶¶ 7-9 - Under-representation claims

King's first three claims concern his allegations that minorities and women were under-represented in the grand jury that indicted him and in the venire from which his jury was chosen. As a result, no minorities or women served on his jury. King alleges the State's use of peremptory challenges unconstitutionally

91

excluded African American jurors in violation of the Sixth and Fourteenth Amendments, and the Tennessee jury exemption statute, Tenn. Code Ann. 22-1-102 *et seq.*, automatically exempted certain classes of people from jury service on the basis of profession or prior criminal conviction, and unfairly narrowed the cross-section of the community from which the jurors were drawn.

King did not raise in state court any claims concerning the composition of the grand jury. On the morning of trial, Davis made an oral motion, and King orally joined in the motion, to strike the prospective jury venire on the ground of under-representation of women and minorities. Counsel argued that, of the seventy-seven (77) prospective jurors, sixty-one (61), or 79.2%, were males, and sixteen (16), or 19.8%, were females. Counsel further argued that only seven (7), or .9%, were African Americans, and it appeared that 60-65% of the prospective jurors were over age fifty. Counsel asked the court to "take judicial notice that statistics indicate . . . the population of Maury County is at least fifty per cent female" and further "take judicial notice that in Maury County the black population is . . . in the neighborhood of thirty to thirty-one or two per cent[.]" (Trial Tr. at 68-69.) When asked if defendants were "contending that either females, or certain age group, or blacks were systematically excluded from this panel," Davis's counsel stated: "I am contending that something happened to them, either they were excluded from the panel, or they were excused in some manner or the other, because I don't see how statistically we could get to where we are unless something of that

nature occurred." (Addendum No. 2, Trial Tr. at 70-71.) Trial counsel did not present any statistical evidence to support the motion.

The trial court denied the motion, noting "there is no contention that any of the group[s] that you mentioned . . . were systematically excluded." (<u>Id.</u> at 71.) From his own experience, the judge observed that the Chairman and three members of the Jury Commission were African American, defendants did not contend the Jury Commission had done anything wrong, and the names were drawn in accordance with state law. The court ruled there were no grounds to establish systematic exclusion "*just on your mere statement* that any of the group[s] that you have complained of, that is younger people, or females, or blacks were systematically excluded; I am going to overrule your motion." (<u>Id.</u> (emphasis added).) The court subsequently denied a renewed motion to strike after the jury was chosen. Counsel did not pursue the issue on direct appeal.[15]

In the first post-conviction petition, King raised for the first time the claims that the jury exemption statute is unconstitutional, African Americans were significantly under-represented on the grand jury that indicted him; and the State

---

[15]King now asserts that such failure was due to ineffective assistance of counsel, but King did not fully exhaust such an ineffective assistance claim in state court. Because the ineffective assistance claim is procedurally defaulted, it cannot serve as cause to excuse the procedural default of failing to raise the jury selection claims on appeal. See <u>Burroughs</u>, 411 F.3d at 668.

93

improperly exercised peremptory challenges to eliminate members of King's race from the jury panel without offering a non-racial reason for exclusion. Yet, at the post-conviction hearing, counsel did not present any evidence to support the claims; counsel only cited cases and argued the law. To the extent King now claims that his post-conviction counsel performed deficiently, ineffective assistance of post-conviction counsel cannot establish cause for a procedural default. <u>Coleman</u>, 501 U.S. at 752-753; <u>Abdus-Samad</u>, slip op. at 14.

The post-conviction court found that King "failed to present any proof that the jury selection system in Maury County at the time of his trial systematically excluded distinctive groups so that it was not reasonably representative of a fair cross-section of its population." (Addendum No. 7, Technical Record, Order Dismissing Petition for Post-Conviction Relief at 23.) On appeal, the Tennessee Court of Criminal Appeals affirmed, noting the issue had been partially raised at trial and then expanded in the post-conviction petition. <u>King</u>, 1989 WL 28912 at *2. The appellate court held the issue "has been previously determined per T.C.A. Statute 40-30-112(a) and/or waived under T.C.A. Section 40-30-112(b)(1) and (2)[,]" citing <u>Doyle v. State</u>, 458 S.W.2d 637 (1970), and <u>Pruett v. State</u>, 501 S.W.2d 807 (Tenn. 1973). <u>Id.</u> Further, the court stated, King failed to show a systematic exclusion of distinct and identifiable groups from the venire panel, citing <u>Duren v. Missouri</u>, 439 U.S. 357 (1979). <u>Id.</u>

94

The Court concludes the state courts clearly made findings that King failed to present evidence to support his claims. Because King failed to develop the factual record in state court, such claims are now procedurally defaulted.  See Keeney v. Tamayo-Reyes, 504 U.S. 1, 9, 11-12 (1992); Byrd, 209 F.3d at 515.  As the Supreme Court stated:

> The state court is the most appropriate forum for resolution of factual issues in the first instance, and creating incentives for the deferral of factfinding to later federal court proceedings can only degrade the accuracy and efficiency of judicial proceedings.

Keeney, 504 U.S. at 9.

King contends the claims are not procedurally defaulted because, at the time the Court of Criminal Appeals ruled in 1989, a matter was "previously determined" according to statute "if a court of competent jurisdiction [had] ruled on the merits after a full and fair hearing." Tenn. Code Ann. § 40-30-112 (a) (1989) (repealed).  King contends a ruling that a claim has been "previously determined" is a ruling on the merits.  See Cone v. Bell, 359 F.3d 785, 790 (6th Cir. 2004), *rev'd on other grounds* Bell v. Cone, — U.S. —, 125 S.Ct. 847 (2005).  A matter was "waived," according to statute, "if the petitioner knowingly and understandingly failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented." Tenn. Code Ann. § 40-30-112(b)(1) (1989) (repealed).

95

King asserts that by "overruling" the issue,[16] the Tennessee Court of Criminal Appeals did not "clearly and expressly state" the claim was barred by state law in accordance with <u>Harris v. Reed</u>, 489 U.S. 255 (1989), and the court's use of "and/or" did not clearly indicate the claim was found to be waived. Even if, as King claims, the appellate court ruled, at least in part, that the fair cross-section claims were "previously determined," there is no question that the appellate court went on to rule that King had failed to develop the factual record and present evidence in support of his claims. Under AEDPA, if a petitioner fails to develop the factual basis for a claim in state court, this Court is forbidden to hold an evidentiary hearing to relitigate that claim unless certain stringent requirements are met, and King has not met those requirements. <u>See</u> 28 U.S.C. § 2254(e)(2).[17] Thus, this Court

---

[16]King asserts the appellate court "overruled" his challenges both to the grand jury and the jury venire, but the appellate opinion is clear that the only issue before the court concerned the constitutionality of the jury exemption statute. <u>King</u>, 1989 WL 28912 at *2.

[17]This statute provides:

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

(A) the claim relies on—

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

96

must defer to the state courts' findings that King failed to develop the record to support his claims.  Byrd, 209 F.3d at 516. This alone constitutes an adequate procedural default sufficient to bar this Court from considering the claims on the merits.  See Keeney, 504 U.S. at 9, 11-12; Byrd, 209 F.3d at 515.

King next asserts the procedural default should not be enforced regarding his jury under-representation claims because he sought investigative funds to pursue the issue, but the court denied his motion.  Moreover, the investigator employed by the federal public defender now representing King began looking for the Maury County records on grand jury and jury selection in 2000 or 2001 and was unable to obtain such records until May 2005. (Docket Entry No. 73-4, Nease Decl. at ¶¶ 3-4.)

The Court finds these arguments are unavailing.  The records concerning the use of grand and petit juries in Maury County through the 1970's and early 1980's were in existence at the time of King's trial in 1982 and thereafter.  While the records may have been kept in disorganized fashion as King alleges, King did not ask the state court to provide funds to hire an investigator to locate and utilize the records until June 1995, during litigation of his

---

         (B) the facts underlying the claim would be
         sufficient to establish by clear and
         convincing evidence that but for
         constitutional error, no reasonable fact-
         finder would have found the applicant guilty
         of the underlying offense.

97

second post-conviction petition. Thus, when the trial court and the Tennessee Court of Criminal Appeals ruled on the fair cross-section claims in 1988 and 1989, King had not requested funds to hire an investigator. By the time he did request such funds in 1995, his fair cross-section claims had been rejected six years earlier by the state courts for failure to develop the factual record. Moreover, any ineffective assistance of counsel in failing to request funds for investigation in connection with the first post-conviction petition cannot establish cause for King's procedural default. See Coleman, 501 U.S. at 752-753; Abdus-Samad, slip op. at 14. Accordingly, the Court concludes that King's claims pertaining to the exclusion of minorities and women from the grand and petit juries are procedurally defaulted.

Even if the claim concerning the exclusion of women was not procedurally defaulted, the Court notes that, at the time King's conviction became final, "it was considerably less than clear" that he, as a male, had standing to raise a constitutional challenge concerning the exclusion of women from the grand jury and the jury. See Coe, 161 F.3d at 352-355.

### ¶ 18 - Reasonable doubt jury instructions

King alleges that the trial court's jury instructions on "reasonable doubt" given at the guilt and sentencing phases were unconstitutional because the instructions required the jury to have a "moral certainty" as to guilt or aggravating circumstances and informed the jury it could convict or sentence to death if it could

98

"let the mind rest easily upon the certainty of guilt."[18]   King raised this claim for the first time in his second post-conviction petition.  On direct appeal from denial of that petition, the Court of Criminal Appeals held King waived the claim under Tenn. Code Ann. § 40-30-112.  <u>King</u>, 1997 WL 59464 at *2.  That ruling erects an independent and adequate state procedural bar to consideration of the claim in this Court.  <u>See</u> <u>Cone v. Bell</u>, 243 F.3d 961, 972 (6th Cir. 2001); <u>Coe</u>, 161 F.3d at 330-331.

In any event, the Court of Criminal Appeals ruled alternatively that the same or similar jury instructions had been found constitutional on many occasions, citing <u>State v. Nichols</u>, 877 S.W.2d 722, 734 (Tenn. 1994); <u>State v. McPherson</u>, 882 S.W.2d 365, 374-375 (Tenn. Crim. App. 1994); and <u>State v. Hallock</u>,

---

[18]The following instruction was given at the guilt phase:

> Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability after such investigation, to let the mind rest easily as to the certainty of guilt.  Reasonable doubt does not mean a captious, possible, or imaginary doubt. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required, and this certainty is required as to every proposition of proof requisite to constitute the offense.

(Addendum No. 2, Trial Tr. at 563.)

The following instruction was given at the sentencing phase:

> Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily as to the certainty of your findings.

(<u>Id.</u> at 679.)

99

875 S.W.2d 285, 294 (Tenn. Crim. App. 1993).  Id.  The Sixth
Circuit has upheld the same instruction in Cone, 243 F.3d at 972,
and in Austin, 126 F.3d at 846 (relying on Victor v. Nebraska,
511 U.S. 1 (1994)).  Consequently, assuming without deciding that
King has not procedurally defaulted his claim or, if he has, that
he can show cause and prejudice, the claim is without merit.

### ¶ 23 - *Ineffective assistance of counsel*

As mentioned earlier, King raises numerous claims alleging
ineffective assistance of trial and appellate counsel.  These
claims assert complaints about counsel's failure to file motions,
object to the composition of the grand jury, argue for change of
venue, effectively conduct voir dire, object to Mrs. Lockridge's
presence at counsel table, object to the verdict, request and
object to instructions, move for severance, and investigate and
impeach Detective Jackson.  Additional claims include opening the
door to bad character evidence, failure to offer Davis's statement
during sentencing, failure to question Juror McKee about his
purchase at Jack's Party Pack, and failure to raise all issues in
the habeas petition on direct appeal.

King has not shown cause and prejudice for the procedural
default of these claims, Coleman, 501 U.S. at 752-753; Burroughs,
411 F.3d at 668, and, as discussed below, he cannot pass through
the actual innocence gateway of Schlup, 513 U.S. at 316.  These
claims are denied.

100

### ¶ 24 - *Improper closing argument at sentencing*

King raised for the first time in his second post-conviction petition the claim that the State improperly argued during sentencing that he deserved the death penalty because he had previously been on probation and was beyond rehabilitation. On appeal from denial of the second post-conviction petition, the Court of Criminal Appeals ruled in 1997 that the issue had been "waived" under Tenn. Code Ann. § 40-30-112 (1990 Repl.) by failure to raise it earlier. The state appellate court's ruling erects an independent and adequate state procedural bar to this Court's consideration of the claim. <u>Abdus-Samad</u>, slip op. at 7; <u>Byrd</u>, 209 F.3d at 520-521. Accordingly, the claim is procedurally defaulted.[19]

### ¶ 27 - *Jury instruction on meaning of a life sentence*

Similarly, King raised for the first time in his second post-conviction petition the claim that the trial court should have given the jury an instruction on the meaning of a life sentence. The Court of Criminal Appeals deemed the claim waived under Tenn. Code Ann. § 40-30-112 (1990 Repl.). That ruling raises an independent and adequate state procedural bar to this Court's consideration of the claim. <u>Abdus-Samad</u>, slip op. at 7. The claim is procedurally defaulted.

---

[19]The Court considered the State's improper arguments when ruling on the claim of trial counsel's ineffective assistance at sentencing in order to show how the State's arguments prejudiced King in light of counsel's failure to introduce mitigating evidence.

101

### ¶ 29 - *Unconstitutionality of the death penalty*

Also in the second post-conviction proceeding, King raised for the first time the issue that the death penalty is unconstitutional because it infringes on the fundamental right to life. The Court of Criminal Appeals ruled that this claim, too, had been waived under Tenn. Code Ann. § 40-30-112 (1990 Repl.). The ruling raises an independent and adequate state procedural bar to this Court's consideration of the claim. <u>Abdus-Samad</u>, slip op. at 7. The claim is procedurally defaulted.

King cannot rely on the alleged ineffective assistance of trial and appellate counsel to establish cause to excuse his procedural default. King would first have been required to exhaust each of the claims in the state courts under the rubric of ineffective assistance, but he did not do so. See <u>Burroughs</u>, 411 F.3d at 668. Therefore, any such ineffective assistance claims cannot serve as cause to excuse King's procedural defaults of his claims on the merits. <u>Id.</u>

### ¶ 30 - *Denial of an effective post-conviction remedy*

King contends he did not have an effective post-conviction remedy because the state courts denied his motion for a court-appointed expert and investigator. Because he was not provided state funds for these purposes, he was unable to develop his claims in state court. The State correctly counters that this claim is not cognizable in federal habeas because the alleged deficiency in the state's post-conviction procedure relates to a state civil matter and not to the custody of the defendant. <u>Roe v. Baker</u>,

102

316 F.3d 571, 570 (6th Cir. 2003). See also Kirby v. Dutton, 794 F.2d 245, 246 (6th Cir. 1986) (habeas corpus is not the proper means by which inmates should challenge errors or deficiencies in state post-conviction proceedings). Even if King "can demonstrate that some error occurred during the state post-conviction proceedings, the claim is not cognizable on federal habeas review." Id. Thus, the Court will not address the merits of this claim. Even if the claim is cognizable, King has not shown that the Tennessee Court of Criminal Appeals' denial of his request for expert services is contrary to, or an unreasonable application of, clearly established Supreme Court law. 28 U.S.C. § 2254(d)(1); Williams, 529 U.S. at 405.

Furthermore, King is not constitutionally entitled to effective assistance of counsel during a post-conviction proceeding; thus, an attack against the procedural sufficiency of the state post-conviction remedy cannot establish cause for procedural default, especially post-AEDPA, even though King claims his first post-conviction proceeding was a "sham" and he was denied funds for experts in his second post-conviction proceeding. See Coleman, 501 U.S. at 752-753; Pennsylvania v. Finley, 481 U.S. 551, 555-559 (1987); Abdus-Samad, slip op. at 14; Roe, 316 F.3d at 570.

### ¶ 38 - Cumulative error

King insists he was denied due process as a result of cumulative error. This claim was procedurally defaulted, Williams v. Bagley, 380 F.3d 932, 969 n. 21 (6th Cir. 2004), and King has not established cause and prejudice to overcome it. Under AEDPA, a

court may only grant habeas relief based on misapplication of Supreme Court law. <u>Bailey v. Mitchell</u>, 271 F.3d 652, 655 (6th Cir. 2001). Because King cannot establish any errors to cumulate other than the two errors the Court has identified, <u>see Coe</u>, 161 F.3d at 340, and "because his theory that errors can be considered in the aggregate depends on non-Supreme Court precedent, this claim is also without merit." <u>Baze v. Parker</u>, 371 F.3d 310, 330 (6th Cir. 2004).

**C. Attempts to Overcome Procedural Default**

*Ineffective assistance of appellate counsel*

King asserts that he can show cause and prejudice for his procedural defaults because appellate counsel failed to render effective assistance in raising the claims on direct appeal from conviction. A procedurally defaulted ineffective assistance claim can serve as cause to excuse the procedural default of another habeas claim only if King can satisfy the "cause and prejudice" standard with respect to the ineffective assistance claim itself. <u>See Edwards v. Carpenter</u>, 529 U.S. 446, 451 (2000); <u>Coleman</u>, 268 F.3d at 432. King has not attempted to show cause and prejudice for the procedural default of ineffective assistance of appellate counsel claims. Therefore, alleged ineffective assistance of appellate counsel cannot establish cause and prejudice to permit the Court to consider each of King's defaulted claims.

*AEDPA's "opt-in" provision*

Next, King suggests Congress eliminated the doctrine of procedural default in all habeas cases except those falling under

104

Chapter 154, 28 U.S.C. § 2261-2266.  Because this case does not fall under Chapter 154, King asserts, his claims are not procedurally defaulted.

In Chapter 154, Congress adopted as part of AEDPA certain provisions advantageous to the states with regard to capital habeas petitioners.  See Skillcorn v. Luebbers, 265 F.3d 687, 689 (8th Cir. 2001).  By its express terms, the chapter applies only if the State establishes a mechanism for the appointment of counsel and the payment of reasonable litigation expenses in state post-conviction proceedings in capital cases.  28 U.S.C. § 2261.  In return for a state's success in setting up such a system, Congress provides that capital habeas proceedings will be subject to a shorter limitations period and federal district courts may consider only claims that have been raised and decided on the merits in the state courts, unless certain restrictions apply.  28 U.S.C. § 2264(a).

King concedes Tennessee is not an "opt in" state.  Therefore, the provisions of § 2264(a) do not apply to this case.  Nothing in Chapter 154 suggests Congress intended that years of procedural default jurisprudence would not continue to apply in a state that failed to "opt in."  The Court is unaware of any federal court that has so held, and King does not cite any case directly supporting his novel idea.  Thus, the issue is without merit.

### Tennessee Supreme Court Review

King suggests the Tennessee Supreme Court necessarily reviewed all of his claims on direct appeal under the guise of its statutorily mandated "arbitrariness" review, and thus, none of his

105

claims can be procedurally defaulted.  The Sixth Circuit rejected the district court's use of similar analysis in Coe, 161 F.3d at 336, observing that such an approach would "eliminate the entire doctrine of procedural bar in Tennessee capital cases."  In light of Coe, this contention is without merit.

### Tennessee Waiver Rule

Relying on Lee v. Kemna, 534 U.S. 362 (2002), and Mitchell v. Mason, 257 F.3d 554 (6th Cir. 2001), vacated on other grounds, 536 U.S. 901 (2002), King next asserts the Tennessee waiver rule cannot constitute an independent and adequate state procedural bar of his claims because the rule is not strictly or regularly followed in the state courts.  Lee does not control in this case. In Lee, 534 U.S. at 365, 380, the prisoner substantially complied with a Missouri procedural rule concerning the presentation of a motion for a continuance, yet the Missouri Court of Appeals declined to hear the merits of the claim and disposed of it on the state procedural bar, even though the prosecutor and trial judge had not mentioned any procedural insufficiency in the motion as grounds for its denial.  Applying Osborne v. Ohio, 495 U.S. 103 (1990), the Supreme Court held the claim could be heard on the merits because Lee's case was one of those exceptional ones in which "exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question."  Lee, 534 U.S. at 376.

"This case is not Lee."  Owsley v. Luebbers, 281 F.3d 687, 690 (8th Cir. 2002).  King failed entirely to raise numerous claims on

106

his direct appeal and in his post-conviction proceedings. The Tennessee Court of Criminal Appeals ruled in King's post-conviction cases in 1989 and 1997, under a firmly established and regularly followed waiver rule, that many of the claims King raised were procedurally barred because of his failure to raise them earlier in accordance with state statute. See Mason, 257 F.3d at 562 (observing procedural bar must be firmly established and regularly followed by the time as of which it is to be applied in order to stand as independent and adequate ground to bar relief); Coe, 161 F.3d at 331. Accordingly, this suggestion for overcoming procedural default is overruled.

### Congressional passage of S.686 for Theresa Marie Schiavo

On March 21, 2005, Congress passed S.686, Pub.L. No. 109-3, allowing plenary, federal de novo review of claims raised by Theresa Marie Schiavo concerning whether the proposed removal of life-sustaining fluids would violate her fundamental right to life, even though state courts had previously ruled on her claims. As a result of S.686, King asserts the Congress and the President have enshrined the principle that where a fundamental right to life is at stake, a federal petitioner cannot be subject to procedural default rules. King reasons that, because he also has a fundamental right to life, principles of due process and equal protection under the Fifth and Fourteenth Amendments preclude this Court from applying rules of procedural default to him that did not apply to Theresa Schiavo.

107

King misconstrues the thrust and purpose of S.686. Congress exercised its power to pass specific legislation in favor of Theresa Schiavo. The provision did not mention AEDPA or allow her to bypass procedural default rules; rather, it conferred jurisdiction on the United States District Court for the Middle District of Florida "to hear, determine, and render judgment" on a suit or claim by or on behalf of Theresa Marie Schiavo alleging the violation of any constitutional right relating to the withdrawal of food, fluids, or medical treatment. Pub.L. 109-3. The initial federal _Schiavo_ complaint was "improperly grounded on _habeas corpus_." _Schiavo ex rel. Schindler v. Schiavo_, 404 F.3d 1270, 1271 (11th Cir. 2005) (Birch, J., specially concurring in denial of rehearing en banc). The plaintiffs' first amended complaint cited Pub.L. 109-3 as its jurisdictional base and relied on other federal statutes, such as the Americans With Disabilities Act, in an attempt to stop the removal of Schiavo's feeding tube. _Id._ Thus, federal habeas law was not implicated by S.686 or the _Schiavo_ case. The Court thus concludes that AEDPA applies in this case and King is not excused from complying with the procedural default rules. _O'Sullivan_, 526 U.S. at 848; _Coleman_, 501 U.S. at 731-732.

### _Actual innocence/miscarriage of justice exception_

King presents an impassioned argument that the victim's death was the result of an accidental shooting. In support, King provides the expert report of Walter I. Hofman, M.D., who opines that Lockridge was shot at close range and that the evidence is consistent with a struggle for the gun and its accidental

108

discharge. (Docket Entry No. 71-3 at 2.) King also provides the Declaration of Gaylan Warren, a forensic consultant, who states his opinion to a reasonable degree of scientific certainty that the forensic evidence is consistent with the conclusion that Lockridge was shot during a struggle for the weapon. He also states that the knowledge and experience of the forensic community in 1982 could have supplied this information. (Docket Entry No. 71-4 at 17.) King also provides the report of Richard N. Ernest, a forensic ballistics consultant, who opines that the close-range gunshot wound, taken in conjunction with the severe downward trajectory of the bullet into the body of the victim, is "consistent with the type of wounding pattern commonly seen in struggle situations where two combatants are wrestling over control of the firearm." (Docket Entry No. 71-4 at 10.)

One of King's trial attorneys, Gary Howell, attests that he reviewed these expert reports and "can state unequivocally that [he] would have presented such evidence on behalf of Mr. King, if [he] had been aware of it at the time of trial." (Docket Entry No. 79-4, Howell Decl. at ¶ 7-8.) Howell further states that King's defense was accident and self-defense, and counsel "tried to convince the jury that Mr. King struggled with Mr. Lockridge after Lockridge reached for his weapon." (Id. at ¶ 9.) He believes the reports are "exactly the kind of evidence that would have established our defense." (Id.)

Based on the new evidence provided, taken in light of other favorable evidence presented at trial, and based on King's argument

109

that no proper aggravating factors were submitted to the jury, King contends he has presented such evidence of actual innocence of guilt and the death penalty that the Court should permit him to "pass through the gateway" of procedural default to argue the merits of his claims.  See Schlup v. Delo, 513 U.S. 298, 316 (1995); Sawyer v. Whitley, 505 U.S. 333, 347 (1992); Abdus-Samad, slip op. at 7.  As to the guilt phase, King must show that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt.  Schlup, 513 U.S. at 327.  Put another way, King must establish that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt."  Id. at 329.  This standard requires the Court "to make a probabilistic determination about what reasonable, properly instructed jurors would do."  Id.  The Court must presume that a "reasonable" juror would consider fairly all of the evidence presented and would conscientiously obey the trial court's instruction requiring proof beyond a reasonable doubt.  Id.

While the new evidence is consistent with King's theory of the shooting, the Court concludes, in light of other evidence presented at trial, that King has not shown it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt.  See Schlup, 513 U.S. at 327.  Trial witness Harris testified that King entered the tavern, fired a shot into the ceiling, and ordered the patrons to the floor, saying, "Here is what it is, I want everybody to lay on the floor and don't move."

110

King stepped over Harris into the kitchen and forced Johnson to the floor. According to Harris, when Lockridge started to move, one of the men told Lockridge, "hold still, you are the one we are going to kill anyhow." He then heard a shot and rolled over. Harris believed King, who was right beside him, fired the shot, and Lockridge fell back to the floor. Venoi heard the first shot outside the bar and the second shot from his hiding place in the bathroom. According to Harris, King searched the victims' pockets and wallets for cash while Davis took money from the cash register. King opened Harris' wallet, but threw it down because Harris did not have any money. King threatened, "We ought to just kill you anyhow." When King learned Harris did not have any money in his wallet, King exclaimed, "Let's just kill them all." Davis warned King not to, and no one else was shot. Harris heard King take money and car keys from Lockridge. King then stepped closer to the kitchen and said, "Don't move, don't even raise your head up an inch, if you do, you don't know if I am gone or not, and I will just blow your brains out." King left the bar, pointed a pistol at Williams and told him to get down on the ground. King and Davis then sped off in Lockridge's car. None of the witnesses testified that King and Lockridge struggled for the gun. Thus, the forensic evidence suggesting that a struggle may have occurred is but one factor reasonable jurors would have to consider in light of other evidence which, as the Tennessee Supreme Court observed, tended to show King's malice. King, 694 S.W.2d at 946. Moreover, Davis offered to sell Webster a .357 magnum pistol the day of, and before

111

the killing, the police recovered Lockridge's car the next day outside the Chattanooga apartment where King was staying, King was arrested in the apartment, he turned over the car keys, and police recovered the weapon behind the bathroom radiator.  Reasonable jurors could find this evidence supported a determination of King's calculated commission of robbery and felony murder, even though King testified he took the gun and car and left Columbia because he was frightened.

Dr. Mauricio testified the bullet that struck Lockridge traveled in a downward trajectory, and medical records introduced by the defense disclosed a powder burn and an entry wound consistent with a shot fired at close range.  The jury thus had this information before them.  Although the new evidence emphasizes the point that the fatal shot was fired at close range, reasonable jurors could still conclude that the forensic evidence did not contradict the witnesses' testimony.  The entire incident took place in close quarters and, according to Harris, Lockridge leapt up to push Davis against the cash register to Harris' left.  King was standing to Harris' right.  Throughout trial, witnesses referred to King as the "tall one" and Davis as the "short one."  It is certainly conceivable for reasonable jurors to find that Lockridge was in a physical position well below King when he raised up to push Davis and that King pointed the gun in a downward direction to shoot Lockridge.  Such a shooting could have been at close range and still not have been accidental.

112

Accordingly, the Court concludes that King has not met the Schlup standard of actual innocence to excuse the procedural default of his guilt-phase claims. Because the Court plans to hold an evidentiary hearing on whether King is entitled to a new sentencing hearing because of ineffective assistance of counsel and failure to disclose Brady evidence, the Court will not address or apply the Sawyer standard for showing actual innocence of the death penalty.

## IV. CONCLUSION

Many of King's claims were procedurally defaulted in state court. The Court addressed several claims on the merits and determined that habeas relief should be denied, but the Court determines an evidentiary hearing is necessary on the claims of trial counsel's ineffective assistance at the penalty phase and the State's failure to disclose Brady material that King could have used to impeach the credibility of the State's rebuttal character witness during the penalty phase. Accordingly, consistent with this opinion, the State's Motion for Summary Judgment will be GRANTED IN PART and DENIED IN PART. King's Petition for Habeas Corpus will be GRANTED IN PART AND DENIED IN PART.

An appropriate ORDER will be entered.

_____

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

113